

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00061-CV

THE CITY OF KELLER                                              APPELLANT

V.

KIMBERLEE DIANE MEADORS                             APPELLEES
HALL AND A. THOMAS HALL

----------

## FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

In this case, we consider whether Appellant the City of Keller established as a matter of law that the trial court had no jurisdiction over the inverse condemnation claim brought by Appellees Kimberlee Diane Meadors Hall and A. Thomas Hall. The Halls sued the City alleging that various actions by the City caused repeated flooding of their property. The City filed a plea to the jurisdiction, which the trial court denied. The City then filed this interlocutory

appeal. In two issues, the City argues that the trial court erred by denying the plea to the jurisdiction because the evidence was insufficient to support a taking claim and because the Halls did not give the City notice of its claim before filing suit. Because we hold that the trial court did not err by denying the plea to the jurisdiction, we affirm.

## Background

Kimberlee and her former husband bought the property consisting of approximately 5.37 acres (the Property) and constructed improvements on it, including a residence, an outbuilding, and two barns. The Property is located in Keller. When Kimberly purchased the Property, much of it was within the 100-year floodplain.

Keller Smithfield Road runs along the western boundary of the property. Big Bear Creek runs just to the north of the Property in a generally west-to-east direction and then turns south to run through the eastern part of the Property. Bear Creek Parkway runs along the Property's southern boundary. After the Halls purchased the Property, a golf club was constructed south of the Property (and downstream of Big Bear Creek) by GCP Keller Golf LP d/b/a Sky Creek Ranch Golf Club. The Property is therefore more or less bordered on the west side by Keller Smithfield Road, to the north by Big Bear Creek, and to the south by Bear Creek Parkway and the golf club, with the creek also running through the eastern portion of the Property.

2

In their petition, the Halls complained about the City's widening the creek bed of Big Bear Creek, raising the road bed of Keller Smithfield Road, and replacing the bridge on that road that passes over the creek. They also complained generally about the City's management and maintenance of the Big Bear Creek waterway and of its authorization of development by others.

The Halls also sued GCP for nuisance. They asserted that in connection with development of the golf club, GCP made changes to the elevation of its property and "also constructed buildings and other structures, some of which . . . invade the 100 year flood plain of Bear Creek," causing water in Bear Creek to back up and flood onto the Property.

The City answered and filed a combined plea to the jurisdiction and motion for summary judgment. The City argued that to be liable on an inverse condemnation claim, a governmental entity "must act for the purpose of causing the invasion onto the property or must have known that the invasion was substantially certain to result from its actions." The City asserted that the trial court lacked jurisdiction because the evidence established as a matter of law (1) that none of the alleged actions of the City proximately caused the flood damages and that (2) the City did not know and was not substantially certain that damage to the Property was going to occur when it took the actions complained of by the Halls. The City also alleged that the trial court lacked jurisdiction because the evidence established as a matter of law that the Halls failed to

comply with a provision of the City's charter requiring them to give written notice of their claim to the city.

As a ground for traditional summary judgment, the City asserted the affirmative defense of consent, arguing that by building in a floodplain, the Halls consented to the damaging of the Property. The City also reframed its jurisdiction arguments as no-evidence summary judgment grounds.

Among its attached evidence, the City included the affidavit of city secretary Sheila Stephens. Stephens attached twenty-two exhibits from the City's records, including the City's charter and documents from the Federal Emergency Management Agency (FEMA).

In their response, the Halls asserted that they had pled multiple acts of invasive flooding "which, according to the Halls' expert, was substantially certain to occur based on the information the City knew, both at the time of the [public works project], and in the years since during in which [sic] these multiple floods have occurred." The Halls asserted that from 1982 to the present, the City underwent significant urbanization "such that the drainage of [the creek] must carry substantially more water from rain and storm run-off now than it did in 1982," that construction by the City had "effectively turned the Property into a detention pond," and that the Halls had put the City on notice of growing drainage and flooding problems as far back as 1999. The Halls attached to their response a report from Frederick Ehler, an engineer hired by the Halls to perform a

4

drainage investigation of the area around the Property. Also with their response, the Halls filed multiple objections to the City's summary judgment evidence.

The trial court sustained a number of the Halls' objections to the City's summary judgment evidence but overruled the Halls' objections to Stephens' affidavit. The trial court overruled the City's plea to the jurisdiction, its tradition summary judgment motion, and its no-evidence summary judgment motion. The City then filed this appeal of the trial court's denial of its plea to the jurisdiction. The Halls, the City, and GCP filed an agreed motion to stay trial proceedings while this appeal is pending.

## Standard of Review

A plaintiff has the burden of alleging facts that affirmatively demonstrate that the trial court has subject-matter jurisdiction.[1] When a plea to the jurisdiction challenges the pleadings, a court looks at the allegations in the plaintiff's pleadings and accepts them as true.[2] If, however, the plea to the jurisdiction challenges the existence of jurisdictional facts, a court must also consider the relevant evidence necessary to resolve the jurisdictional issues raised.[3]

---

[1]*Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex. 1993).

[2]*Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

[3]*Id.* at 227; *see also City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010) ("[W]e consider the plaintiff's pleadings and factual assertions, as well as any evidence in the record that is relevant to the jurisdictional issue.").

When a jurisdictional challenge also implicates the merits of the plaintiff's claim, then the trial court considers the evidence submitted by the parties to determine if a fact question exists.[4] If the evidence creates a fact question about the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction; instead, the trial court must leave the fact issue for determination by the factfinder.[5] But if the evidence is undisputed, or if the evidence does not raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law.[6]

We review a trial court's ruling on a plea to the jurisdiction de novo.[7] When reviewing the trial court's determination of a plea to the jurisdiction when the pleading requirement has been met and evidence has been submitted to support the plea that implicates the merits of the case, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor.[8]

---

[4]*Miranda*, 133 S.W.3d at 227.

[5]*Id.* at 227–28.

[6]*Id.* at 228.

[7]*City of Elsa*, 325 S.W.3d at 625.

[8]*Miranda*, 133 S.W.3d at 228.

6

## Inverse Condemnation

Article 1, section 17 of the Texas Constitution provides, "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person."[9] The three distinct claims allowed by this section—taking, damaging, and destruction of property—are all commonly referred to as a "taking."[10]

A taking may be physical or regulatory.[11] A physical taking may occur when the government unreasonably interferes with a landowner's right to use and enjoy his or her private property.[12] When a government takes property without compensating the landowner, the owner may recover damages for inverse condemnation.[13] Whether particular facts rise to the level of a taking is a question of law.[14] Mere negligence that eventually contributes to property damage does not constitute a taking.[15] To establish a taking claim, the plaintiff must show that "(1) a governmental entity intentionally performed certain acts (2)

---

[9]Tex. Const. art. I, § 17(a).

[10]*See City of Dallas v. Jennings*, 142 S.W.3d 310, 313 n.2 (Tex. 2004).

[11]*Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004).

[12]*Id.*

[13]*Id.*

[14]*Gen. Servs. Comm'n v. Little-Tex Insulation Co., Inc.*, 39 S.W.3d 591, 598 (Tex. 2001).

[15]*Id.*

that resulted in a taking or damaging of property (3) for public use."[16] Thus, only an intentional act will give rise to liability under this constitutional provision.[17]

Not every intentional act by a governmental entity will give rise to a taking claim. A plaintiff's taking claim may not be based on only an assertion that the governmental entity intended to do the act that caused the damage; "[w]hen damage is merely the accidental result of the government's act, there is no public benefit and the property cannot be said to be 'taken or damaged for public use.'"[18] But neither must a government intend to damage the property; "if the government knows that specific damage is substantially certain to result from its conduct, then taking liability may arise even when the government did not particularly desire the property to be damaged."[19] Thus, liability for a taking arises when a governmental entity physically damages private property in order to confer a public benefit if that entity "(1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action—that is, that the damage

---

[16] *City of Dallas v. Zetterlund*, 261 S.W.3d 824, 828 (Tex. App.—Dallas 2008, no pet.); *see also Little-Tex Insulation Co.*, 39 S.W.3d at 598.

[17] *See Zetterlund*, 261 S.W.3d at 828.

[18] *See Jennings*, 142 S.W.3d at 313–14.

[19] *Id.* at 314.

is 'necessarily an incident to, or necessarily a consequential result of' the government's action."[20]

### Immunity

The State is generally immune from suit in the absence of an express waiver of its sovereign immunity.[21]  Immunity from suit (as opposed to immunity from liability) deprives a trial court of subject matter jurisdiction in lawsuits in which the State has been sued without the unit's consent.[22]  Cities are political subdivisions of the State and are also entitled to sovereign immunity—referred to as governmental immunity—when performing governmental functions.[23]

Section 17 of the Texas Constitution waives immunity for a taking.[24]  Thus, sovereign immunity does not shield the State from a taking claim.[25]  But because the plaintiff in a suit against a governmental entity must allege a valid waiver of immunity to show jurisdiction, a plaintiff in a taking suit must allege a valid taking

---

[20] *Id.* (citation omitted).

[21] *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007).

[22] *Miranda*, 133 S.W.3d at 224.

[23] *City of Galveston v. State*, 217 S.W.3d 466, 469 (Tex. 2007); *Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006).

[24] *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980); *Porretto v. Patterson*, 251 S.W.3d 701, 707 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

[25] *Holland*, 221 S.W.3d at 643.

9

claim.[26]  That is, when the basis for jurisdiction is the assertion of a taking claim, the taking claim alleged must be a valid one.[27]  A trial court should therefore grant a plea to the jurisdiction when a government defendant produces evidence to show as a matter of law that the plaintiff cannot establish a viable taking claim.[28]

Here, the City argues that the evidence shows that the Halls do not have a valid taking claim, and therefore the trial court did not have jurisdiction.  Because the City's jurisdictional evidence also implicates the merits of the Halls' case, the trial court could not have granted the plea to the jurisdiction if the evidence created a fact issue regarding jurisdiction.[29]

**National Flood Insurance Program (NFIP)**

Much of the evidence in this case involves various documents produced for or issued under a federal flood insurance program.  We therefore briefly discuss the program and some regulations issued under it.

---

[26] *See Tex. Ass'n of Bus.*, 852 S.W.2d at 446; *see also Tex. Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 390 (Tex. 2011) (holding that the Trust "did not assert a valid takings claim giving the trial court jurisdiction over its claim").

[27] *See Tex. Ass'n of Bus.*, 852 S.W.2d at 477–78.

[28] *Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013); *Miranda*, 133 S.W.3d at 228.

[29] *Miranda*, 133 S.W.3d at 227–28.

10

Congress enacted the National Flood Insurance Act of 1968 as part of Title XIII of the Housing and Urban Development Act of 1968, establishing a national flood insurance program "to provide previously unavailable flood insurance protection to property owners in flood-prone areas."[30]  For a community to qualify for the sale of federally-subsidized flood insurance, the community must adopt floodplain management regulations designed to reduce or avoid future flood damages.[31]  The adopted regulations must satisfy, at a minimum, the criteria set out in federal regulations issued under the program.[32]

The applicable statutes and regulations of the program define various terms that are used by the parties in this case.  The parties' pleadings and evidence include references to the terms "flood plain," "base flood elevations," and "100-year flood."  Federal regulations define a "flood plain"[33] as "any land area susceptible to being inundated by water from any source."[34]  The term "100-year floodplain" means an area that "is subject to inundation from a flood having

---

[30]44 C.F.R. § 59.2(a) (last amended 2009); *see also* 42 U.S.C.A. §§ 4001, 4011 (West 2012 & Supp. 2013).

[31]44 C.F.R. § 59.2(b).

[32]*Id.* § 59.2(c).

[33]The term is sometimes spelled as one word and sometimes as two.  *See* 42 U.S.C.A. § 4004 (West Supp. 2013) ("floodplain"); 44 C.F.R. § 59.1 (last amended 2009) ("flood plain").

[34]44 C.F.R. § 59.1.

a 1-percent chance of being equaled or exceeded in any given year."[35]  A "100-year flood" is also called a "base flood."[36]  A "base flood elevation" refers to the "elevation to which floodwater is anticipated to rise during the base flood."[37]  A flood insurance premium is determined by "[t]he relationship between the [base flood elevation] and a structure's elevation."[38]

The parties also refer to a "Flood Insurance Rate Map" (Rate Map) which is "an official map of a community on which the Federal Insurance Administrator has delineated both the special hazard areas and the risk premium zones applicable to the community."[39]  With respect to floods, a "special flood hazard area" is the land in a community's 100-year floodplain.[40]

---

[35]42 U.S.C.A. § 4004(a)(1).

[36]*See* FEMA, Designing for Flood Levels Above the BFE 1 (2010) (discussing the terms "100-year flood" and "base flood"), *available at* http://www.fema.gov/media-library-data/20130726-1537-20490-8057/fema499_1 _6_rev.pdf; FEMA, Base Flood, http://www.fema.gov/national-flood-insurance-program/base-flood (same).

[37]FEMA, Base Flood Elevation, http://www.fema.gov/national-flood-insurance-program/base-flood-elevation (last visited April 1, 2014).

[38]*Id.*

[39]44 C.F.R. § 59.1.

[40]44 C.F.R. § 59.1. (defining "special hazard area"); *see also* Floodsmart.gov, What is a Special Flood Hazard Area (SFHA)?, http://www.floodsmart.gov/floodsmart/pages/faqs/what-is-a-special-flood-hazard-area.jsp (last visited April 2, 2014) (stating that "[l]and areas that are at high risk for flooding are called Special Flood Hazard Areas (SFHAs), or floodplains").

These special hazard areas are designated on a Rate Map or on another type of map, the Flood Hazard Boundary Map.[41] The Rate Map "is prepared after the flood hazard study for the community has been completed and the risk premium rates have been established. The [Rate Map] indicates the risk premium rate zones applicable in the community and when those rates are effective."[42]

The parties also refer to a "Flood Insurance Study," also called a "flood elevation study," which is "an examination, evaluation and determination of flood hazards and, if appropriate, corresponding water surface elevations."[43] FEMA alternatively defines the term as "a compilation and presentation of flood risk data . . . within a community" and states that when a flood study has been completed for the NFIP, the information and maps are assembled into a report.[44]

One purpose of a Flood Insurance Study is to develop floodway data that communities use "to select and adopt floodways as part of the flood plain management program" that is required by federal regulations.[45] The term "floodway" as used in the regulations of the flood insurance program refers to

---

[41]44 C.F.R. § 59.1.

[42]44 C.F.R. § 64.3(a)(1) (last amended 2009).

[43]44 C.F.R. § 59.1.

[44]FEMA, Flood Insurance Study, http://www.fema.gov/floodplain-management/flood-insurance-study (last visited April 2, 2014).

[45]44 C.F.R. § 65.7(a) (last amended 1986).

"the channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than a designated height."[46]  A Flood Insurance Study report can be used in conjunction with a Rate Map to determine whether a site is located in a floodplain or floodway and to determine the base flood elevation.[47]  The Flood Insurance Study report for a community includes information on the community's flood problems and flood protection; the engineering methods used in the study; the hydrologic analysis ("how much water will flow through the floodplain during peak floods"); and the hydraulic analysis ("how high the water will get"); where the flood water will go; and the floodway study and mapping, if the study includes a floodway determination.[48]

The Act directs the Administrator of FEMA to "assess the need to revise and update all floodplain areas and flood risk zones" at least once every five years, or more often if necessary.[49]  Based on this assessment, the Administrator

---

[46]44 C.F.R. § 59.1; *see also First Chicago Bank of Ravenswood v. City of Elmhurst*, No. 90 C 6362, 1991 WL 160886, at *1 (N.D. Ill. Aug. 14, 1991) (mem. op.) ("A flood plain is an area subject to flooding, while a floodway is an area within a flood plain capable of carrying fast-moving flood discharge.").

[47]FEMA, Using NFIP Studies and Maps, *in* Managing Floodplain Development Through the National Flood Insurance Program 4-3 (2007), *available at* http://www.fema.gov/library/viewRecord.do?id=2108 (last visited April 2, 2014).

[48]*Id.* at 4-3–4-4.

[49]42 U.S.C.A. § 4101(e) (West 2012 & Supp. 2013).

must revise and update any floodplain areas and flood-risk zones. The Administrator must also make updates or revisions if requested to do so by a state or local government if the government unit's request states that specific floodplain areas or flood-risk zones in the state or locality need revision or updating and if sufficient technical data justifying the request is submitted.[50]

A local government may request FEMA to comment on a planned project by requesting a conditional letter of map revision (CLOMR).[51] A CLOMR is "FEMA's comment on a proposed project that would, upon construction, affect the hydrologic or hydraulic characteristics of a flooding source and thus result in the modification of the existing regulatory floodway, the effective base flood elevations, or the Special Flood Hazard Area."[52] After the project's completion, the government may request that FEMA issue a letter of map revision (LOMR). Regulations define a LOMR as "FEMA's modification to an effective [Rate Map], or Flood Boundary and Floodway Map (FBFM), or both."[53] A Flood Boundary

---

[50]*Id.* § 4101(f).

[51]44 C.F.R. § 65.8 (last amended 1997) ("A community . . . may request FEMA's comments on whether a proposed project, if built as proposed, would justify a map revision. FEMA's comments will be issued in the form of a letter, termed a Conditional Letter of Map Revision.").

[52]44 C.F.R. § 72.2 (last amended 1997).

[53]*Id.*

and Floodway Map is a type of flood map (no longer produced by FEMA) that shows only the floodway and flood boundaries.[54]

## Analysis

The City begins its brief by quoting some lines from Creedence Clearwater Revival's song "Who'll Stop the Rain?" The City believes that its actions did not contribute to the problem on the Property, but we assume that the quoting of the lyrics is not meant to make light of the Halls' situation. But the City did not explain how the lyrics could help us decide this case, and we therefore give no weight to them.

*Whether the Halls Alleged a Valid Taking Claim*

In its first issue, the City argues that the trial court did not have subject-matter jurisdiction over the Halls' inverse condemnation claim because the evidence showed that the City did not know and was not substantially certain that the actions it took to approve development or construct public improvements would result in specific damages to the Property.

The Halls' Petition

To address the City's issue, we must look at the Halls' claim, the City's plea to the jurisdiction and jurisdictional evidence, and the Halls' response and evidence. In their petition, the Halls claimed that "[t]he effect of the raising of the road bed adjacent to the Property was to create a dam which caused any water

---

[54]FEMA, Flood Map, https://www.fema.gov/national-flood-insurance-program-2/flood-map (last visited April 2, 2014).

16

backing up the creek to be pooled on the Property rather than continuing to back flow up Bear Creek." They claimed that this project, the City's actions in managing and maintaining Big Bear Creek, and the City's authorization of the development of other properties by other persons effectively "turned the Property into a retention pond[55] which would hold flood waters on the Property rather than permitting them to back up across Keller Smithfield Road." The Halls alleged that "it was [the City]'s intent to create the circumstance whereby, in the event of localized flooding, Keller Smithfield Road would remain open and the park would not be flooded" and that "the City knew that the result would be that any such flood waters would be pooled and retained on the Property, rather than flowing back upstream across the road and into the city park." They asserted that in changing the bridge and raising the roadway, the City "knew that the resulting effect would be to cause rainfall and runoff to pool and flood the Property while preventing and saving the road and the adjacent city park from flooding."

---

[55]The Halls used the term "detention pond" in their response to the plea to the jurisdiction, and that is the correct term for the effect they describe. *See* Laramie County Conservation District, Best Management Practices for Stormwater Runoff, Ponds, http://www.lccdnet.org/wp-content/uploads/2011/04/Ponds.pdf (last visited April 2, 2014) (stating that a "retention pond has a permanent pool of water that fluctuates in response to precipitation and runoff from the contributing areas," whereas detention ponds "are usually dry except during or after rain or snow melt" and "[t]heir purpose is to slow down water flow and hold it for a short period of time"). In either case, their assertion is that the Property has become a water storage facility that holds stormwater that, before construction of the improvements, would have flooded the road and park.

17

<u>The City's Plea to the Jurisdiction</u>

The City alleged that the trial court did not have jurisdiction because (1) the evidence established as a matter of law that the City did not know and was not substantially certain that damage to the Property was going to occur when it took the actions complained of, (2) the evidence established as a matter of law that none of the actions of the City proximately caused the flood damages, and (3) the Halls failed to comply with the notice provision of the City's charter.

The City's argument below and on appeal was that "[t]he evidence shows that, at the time the City approved or built the complained of projects, there was no information to suggest that those projects would cause flooding on the Hall property." If and to the extent that the City argues that it was not explicitly told that there was cause for concern and therefore the trial court had no jurisdiction because substantial certainty can never be shown by circumstantial evidence, we reject this line of thinking.[56] We will consider, however, whether the jurisdictional evidence in the record, including circumstantial evidence, raised a fact question about the City's knowledge, taking as true all evidence favorable to the Halls and indulging every reasonable inference and resolving any doubts in their favor.[57]

---

[56] *See, e.g.*, *City of Corsicana v. Stewart*, 249 S.W.3d 412, 415 (Tex. 2008) (stating, in the context of knowledge of a dangerous condition, that circumstantial evidence shows actual knowledge of the condition "when it 'either directly or by reasonable inference' supports that conclusion") (citation omitted).

[57] *See City of Elsa*, 325 S.W.3d at 625 (stating that in reviewing a plea to the jurisdiction, we consider "any evidence in the record that is relevant to the jurisdictional issue"); *Miranda*, 133 S.W.3d at 227–28.

The City argued that the Property has always had a tendency to flood and no acts of the City made the flooding problem worse, and therefore the Halls could not show intent or causation. The City observed that most of the Property, including where the barns are located, was already in the floodplain before any construction by the City. In support of this assertion, the City attached documents related to the City's participation in the NFIP. The documents included excerpts from the 1982, 1993, and 1995 Rate Maps covering the City, the 1982 Flood Insurance Study, the 1995 Flood Insurance Study, and a 1982 Flood Boundary and Floodway Map.

The City's Evidence

In reviewing the City's evidence, we are careful not to conflate the standards and practices relating to a municipality's participation in the NFIP with the law on what actions by a government do or do not constitute a taking. Thus, the City's compliance with the NFIP does not by itself preclude a taking claim. But the City's correspondence with FEMA in relation to the NFIP program has relevance to this taking suit to the extent that the City states in the correspondence what effect it expects certain construction projects to have on floodways.

The City asserted that the 1982 Rate Map indicated that the base flood elevation near the Property was between approximately 645 feet and 643 feet. The attached Rate Map has been marked up, encircling a section of the map, presumably to show the Property's location. Part of this marked section shows a

base flood elevation of 645 feet, but the markings obscure the other base flood elevation measurement that is printed on the section.

The 1982 Flood Boundary and Floodway Map also has a section of it circled. The marked section is labeled "RM 5" and shows a cross-section of Big Bear Creek that is labeled "AF." The City asserted that this cross-section of the creek is immediately downstream from Keller Smithfield Road. The map has a chart of "elevation reference marks" indicating the base flood elevation for the section labeled RM 5, but the chart is illegible.[58] The 1982 Flood Insurance Study, excerpts of which the City attached to the plea, indicated that the base flood elevation at cross-section AF was 644.9 feet. From these documents, then, we can conclude that in 1982, the federal government concluded that the base flood elevation near the Property was around 645 feet.

The City asserted that the 1993 and 1995 Rate Maps "depict[ed] near identical conditions" to those depicted in the 1982 NFIP documents. The copy of the 1993 Rate Map in the appellate record is difficult to read, but the circled part of the map (presumably the section where the Property is located), has a base flood elevation of what looks like 645 feet. The Rate Map included with the 1995 Flood Insurance Study shows a cross-section of the creek just downstream of Keller Smithfield Road as having a base flood elevation of 645 feet. As the City

---

[58]The dissent disagrees with our characterization of this chart as "illegible." The print on the chart (including the original exhibit, which was included in the record) is so small and blurry that we are unable to read it even with the aid of a magnifying glass, hence our description of it as illegible.

20

pointed out in its plea, the Flood Insurance Study includes a chart that more precisely lists the base flood elevation at that cross-section at 644.9 feet. Accordingly, the 1995 NFIP documents show about the same base flood elevation near the Property as depicted in the 1982 documents.

After asserting these facts, the City discussed in its plea various documents filed with FEMA regarding the development about which the Halls complained. It began with revisions to the Rate Map that were sought because of the golf club's construction. This CLOMR request was submitted by an engineering firm in January 1997 on behalf of the golf club developers. The City attached a few pages of the request to its plea, including the page on which the applicant stated that all increases to the base flood elevation resulting from the construction would be located on the golf club's property. FEMA issued the requested CLOMR, stating in the letter that it had reviewed the data submitted and that if the project were constructed as planned, "a revision to the [Rate Map] would be warranted."

The City stated in its plea that the work maps and calculations done "on the several creek cross-sections located at or near the [Property] indicate that the changes made by the golf course construction would not significantly alter the 100-year flood plain at the Hall property." We assume the City refers to the base flood elevation calculations, as these are the only calculations from the CLOMR that the City referenced and explained in the plea. The City stated in the plea that the map included with the CLOMR request indicated that the base flood

21

elevation at cross-sections of the creek near the Property were between 642.87 and 644.58 feet before construction and would be 641.76 and 644.41 feet after construction. The chart from the part of the CLOMR that was included in the record lists cross-sections of the creek. One column on the chart, labeled "NCWSEL," contains numbers at cross-sections AC and AD that match these figures cited by the City, except that one of the numbers is 642.78 rather than 642.87. Assuming that this column refers to the base flood elevation, this CLOMR request shows that the engineering firm represented to FEMA that it estimated that the construction of the golf club would result in a slightly lower base flood elevation near the Property.

The City then discussed in its plea the effect of the construction of a pedestrian bridge over Big Bear Creek. This bridge was constructed downstream of the Property, 690 feet downstream of Keller Smithfield Road. An April 2001 study was conducted by an engineering firm to evaluate the effect of installing the bridge. The City does not state who commissioned the study or who built the bridge, but the study is titled "Big Bear Creek Trail Connection" and appears to relate to an extension of the City's municipal hike and bike trail system. Two different plans were considered. The study concluded that one plan would cause "a slight increase in the water surface elevations through the study reach" that "could further damage properties already in the floodplain in the event of a flood event." With the second plan, elevations would remain the same or be slightly lower.

22

Two charts included in the study show current elevations at certain creek cross-sections and projected elevations using the two plans. Several sections have asterisks drawn next to them, and we assume these asterisks indicate cross-sections near the Property. The chart for the first plan depicts a rise in the base flood elevation of between 0.12 and 0.09 feet (about 1.5 inches) at the marked cross-sections, and the chart for the other plan shows a lower base flood elevation of about 0.03 feet by the marked cross-sections. The report stated that "[t]he velocities are slightly higher in the upstream cross sections, but there are no erosive velocities noted." The bridge was constructed using the second plan. Thus, according to this engineering firm's representations, construction of the pedestrian bridge should have resulted in a slightly lower base flood elevation at cross-sections of the creek that we assume are near the Property.

The City then discussed in its plea the construction of Keller Town Center and the Keller Smithfield Road bridge. The City attached some of the pages from a request for a CLOMR, submitted to FEMA in June 1999, regarding the Town Center, the bridge, and the new Bear Creek Parkway. The City asserted that a study done in connection with the request showed that the projects would cause no increase or change in the base flood elevation or water velocity at the Property. The City stated that FEMA issued the CLOMR in January 2000.

The excerpts of the CLOMR request that the City attached to its plea included a chart and a map. The map showed numbered cross-sections of Big Bear Creek, and the chart indicates the base flood elevation at those cross-

23

sections.  The chart has an asterisk next to two sections.  We assume that these are the sections that are at or near the Property.  The base flood elevations at these two sections are 643.82 feet and 643.95 feet, respectively.  The chart states that the base flood elevation for the first section before construction was 644.89 feet, indicating a slight decrease in the base flood elevation.  The chart does not contain any data for the pre-construction base flood elevation of the second section.  This information shows that in 1999 the City represented to FEMA that these construction projects would cause a slight decrease in the base flood elevations.

FEMA issued the requested CLOMR in 2000.  The CLOMR stated that, based on the data submitted, if the project were constructed as shown on the map submitted with the request and if FEMA received certain data, a revision to the Rate Map would be warranted.  It observed that, based on the submitted data, as a result of the proposed projects, the base flood elevations would increase in some places along Big Bear Creek and decrease in others.  It also noted that the width of the floodplain and regulatory floodway for Big Bear Creek would increase in some areas and decrease in others.[59]

The City attached to and discussed in its plea two separate LOMRs issued by FEMA with respect to the projects included in the 2000 CLOMR.  The first

---

[59]The CLOMR also stated that there would be increases along a tributary that "appear to be in violation" of NFIP regulations, but the CLOMR does not indicate that the tributary is at or near the Property.

LOMR related to the Town Center and the parkway. A request for this LOMR was submitted to FEMA in November 2002. This LOMR request came after completion of the Town Center and Bear Creek Parkway but before completion of the Keller Smithfield Road bridge project. The City asserted in its plea that this LOMR request showed either no changes or a decrease of both the flood elevation and water velocity at the cross-sections of the creek at the Property. The City included some of the pages from this request, including a chart that, like the 1999 CLOMR request, lists cross-sections of the creek and the base flood elevations before and after completion of the projects. Five cross-sections are marked with an asterisk. These cross-sections show no changes to the base flood elevations and slight increases or decreases in the encroachment water surface elevation; the term "encroachment water surface elevation" is not defined in the LOMR or mentioned in the plea, so we assume that the City did not believe this section of the chart to be relevant to the jurisdictional issue. Thus, this evidence shows that in 2002, the City represented to FEMA that, as per its previous estimates, there was no increase in the base flood elevations of the creek near the Property after construction of the Town Center and parkway.

The second LOMR request related to the construction of the bridge on Keller Smithfield Road. This LOMR request was submitted to FEMA in September 2009. The LOMR request was submitted after a revised Rate Map and Flood Insurance Study, discussed below, became effective in September 2009. The attached portions of the request include charts indicating that the

Bear Creek cross-section AK had a base flood elevation before the project of 642.6 and an elevation of 642.4 feet after the project.

Thus, this LOMR request shows that the City represented to FEMA that the construction of the Keller Smithfield Road bridge would result in a slight decrease of the base flood elevation at this cross-section of the creek. FEMA issued the requested LOMR in April 2010. The LOMR revised the base flood elevation for cross-section AK in accordance with the City's request.[60]

The City also discussed in the plea various revisions to the Rate Map and the Flood Insurance Study covering Tarrant County. The City stated that in 2007, FEMA had a new Flood Insurance Study conducted and made revisions to the Tarrant County Rate Maps in light of the new Flood Insurance Study. These maps became effective on September 25, 2009. Preliminary copies were given to the City on May 31, 2007, a few weeks before one of the floods that the Halls complained about in their suit. The City asserted that, under the 2007 preliminary Flood Insurance Study and Rate Map, the Property "continues to be almost completely inundated by the 100-year flood plain" as it had been under the 1982, 1993, and 1995 Rate Maps. The City stated that the new Flood Insurance Study showed a lower base flood elevation at cross section AK

---

[60]The LOMR again showed an increase in base flood elevation for several cross-sections of the same tributary mentioned above, which appears to be somewhere upstream of Keller Smithfield Road.

immediately downstream of the Keller Smithfield Road bridge. However, we are unable to read the copy of the Rate Map that was included in the record.

The excerpt of the Flood Insurance Study pointed out by the City is a chart listing base flood elevations for cross-sections of the creek. For cross-section AK, which the City contends is the cross-section immediately downstream of Keller Smithfield Road bridge (which would presumably be indicated on the map if we were able to read it), the base flood elevation is 642.6 feet. The City also pointed to a chart showing "flood profiles" for the creek, and from our reading of it, this chart does indicate that the cross-section AK is near Keller Smithfield Road. The City also included a 2009 letter from FEMA stating that the preliminary base flood elevations were considered final and that the Rate Map would become effective on September 25, 2009.

The City concluded this section of its plea by arguing that "[t]he evidence shows that, at the time the City approved or built the complained of projects, there was no information to suggest that those projects would cause flooding on the Hall property." It stated that "[t]he evidence shows that, from the earliest studies, the Hall property was always susceptible to flooding and nothing the City has done since then has exacerbated or worsened that condition. Thus, the evidence establishes the Halls cannot satisfy the intent element of their inverse condemnation claim." The City argued that this same evidence showed there is no proximate cause.

To summarize, the City's evidence indicated that in 1982, cross-sections of the creek at or near the Property had a base flood elevation of between 643 feet and 645 feet; that by 2009, a cross-section of the creek near the Property had a base flood elevation of 642.6 feet; and that within that time frame, the City's estimates, accepted by FEMA, showed no significant variance in the base flood elevation of the creek near the Property. That is, the estimates of engineering firms retained by the City were that after all the construction, flood water would not rise to a higher level than it would have risen before the construction. FEMA accepted these estimates, and the Flood Insurance Study done on FEMA's behalf in 2007 did not contradict the estimates. The City argued below and argues here that this evidence demonstrated as a matter of law that it did not know that the Property was substantially certain to become a de facto detention pond as a result of the improvements complained of.

The Halls' Response: The Facts Alleged

In the Halls' response, they asserted that before the public works projects undertaken by the City, Keller Smithfield Road and its bridge were at substantially the same elevation as the Property and within the creek's floodplain. The City raised the road nine feet above the elevation of the Property, the bridge was substantially raised, and its opening was substantially widened.

The response further asserted that from 1982 to the present, the City underwent "significant growth in urbanization such that the drainage of [the creek] must carry substantially more water from rain and storm run-off than it did

28

in 1982." They claimed that the "detention pond" problem developed because "[a]n increased volume of water now floods through a significantly larger opening under the bridge [over the creek] into the same size creek which transects the Property and flows out through the same sized outlet at its south boundary onto property owned by [the golf club]." And "[a]s storm water run-off exceeds the capacity of [the creek's] channel to carry it south through the Property, [the creek] floods up over the Hall Property, well beyond the drainage easement . . . and in and from areas not subject to the easement." Then, "[a]s such flood waters rise, they cross the entirety of the Property, ultimately reaching the raised roadway approaches of [Keller Smithfield Road], which act as a dam," resulting in the Property "storing the storm water run-off until such time as the constricted outlet through [the golf course] can allow the run-off to dissipate."

The Halls alleged that before all the development, the Property had been subject to occasional, relatively minor flooding of not more than six inches, but that since the completion of the Keller Smithfield Road project and the bridge, the Property has suffered at least six severe floods that inundated the Property to a depth of between three and five-and-a-half feet. They asserted that each of the floods was caused by a rain event that, under the standards of the City's development code, did not exceed a two-year, one hour rain event or a 100-year twenty-four hour rain event.

The Halls further asserted that the City knew of the increasing storm and rainfall run-off being carried by the creek due to increasing development, that

29

City records showed that increased run-off due to development was and is substantially certain to cause flooding of the Property, and that the City has not undertaken any remedial action nor paid any compensation for the invasion of the Property by flooding or storm-water runoff.

The Halls' Response:  The Attached Evidence

The evidence attached to the Halls' response included Kim's affidavit, Thomas's affidavit, and an affidavit and report from an engineer.   In Kim's affidavit, she stated that from when she first acquired the Property up until completion of the bridge and road project, there would be flooding at the Property from time to time.   This would occur during times of significant rainfall, when water from upstream would flood the park, spill over Keller Smithfield Road, and run into the Property.  She stated that

> Beginning in February 1999, I began making inquiries with the City expressing my concern about [the] growing drainage problems on the Property.   Among other occasions, such concerns were expressed in a letter I wrote to Lyle Dresher, who was then City Manager of [the City] on February 18, 2001. . . .   These concerns were also expressed at other times in meetings with various City officials and representatives, including Ed Ilschner [the director of public works for the City], and the engineering firm [retained by the City to prepare various NFIP documents].  These concerns grew as development around the Property continued, and especially once construction of the road and bridge project was underway, when I was able to see and understand the extent to which the Property was being turned into a "bowl" with the raised roadway of Bear Creek Parkway East immediately south of the Property, and now significantly raised roadway of Keller-Smithfield Road South immediately west of the Property.  These concerns resulted in me writing an email to [Ilschner] on April 14, 2005, in which I complained that it appeared the Property was being turned into "a lake."

30

. . .

8.     In May of 2005, I received a letter from [Ilshner], which spoke about a two-year plan to improve drainage, and which listed my complaints as being categorized as related to "potential public storm water capacity or erosion problems."

. . .

9.     Since completion of the road and bridge project, the Property has suffered six significant flood events [in 2007, 2009, and 2010]. In each of these instances, the Property flooded to a depth of three feet or more.

The Halls also included Thomas's affidavit, which made similar allegations.

He further stated that

With the old road and bridge configuration, the opening under the existing bridge and the [Big Bear Creek] creek channel were substantially the same width and depth as where [Big Bear Creek] crossed the south line of the Property flowing out of the Property and into the [golf club].  With the new configuration, the outflow opening remained the same, but the creek channel and bridge opening at [Keller Smithfield Road] and [the creek] were substantially larger— on a scale of 3 to 4 times larger.  The creek channel was widened, there were concrete abutments and rip rap in place where vegetation had previously lined the banks of the creek, and the height of the bridge raised the top of that opening by almost 10 feet above the previous bridge/roadway level, such that in times of flood it was clear that much more water would flow through the opening and downstream before reaching the much smaller outflow opening on our south property line.  With nowhere for that increased flow to exit, it was clear that it would inundate the Property in an unprecedented manner.

5.     Since the completion of the road and bridge project . . . the flooding we have experienced at the Property in fact far exceeds that which previously occurred at the Property.

The Halls included excerpts from the deposition of Gregory Dickens, the

City's current public works director, who is a licensed professional engineer and

31

certified floodplain manager, in which he acknowledged that the only reason for a roadway to be raised out of a floodplain is to prevent flooding of the roadway: "there wouldn't be another reason. That would be why you would raise the road." This testimony indicated that the City raised Keller Smithfield Road to keep water from flooding it.

The Halls also attached an affidavit and report from licensed professional engineer Frederick Ehler. In his affidavit, he stated that since Kim's acquisition of the property in 1985, "there have been [three] developments and [two] road improvement projects constructed within a 600 foot radius to the Property." He opined that "[t]hese projects, combined with substantial development upstream (and downstream) from the Property, have resulted in much more water being carried as run-off in the BBC drainage basin, even in periods of relatively light rain." He stated that government regulations and city ordinances required each of the projects to submit impact studies of how the development would affect drainage in the area, but "[d]espite the fact that in each case such submissions were done, and that each such submission was a part of the City's records, each succeeding project was considered and approved based on a flood and drainage model which *did not account for* the prior development and increased run-off along [the creek] or the cumulative effect of the changes in drainage which resulted from such prior development." [Emphasis added.] He concluded that "[t]he cumulative effect of these approved development plans was and is substantially certain to cause flooding at the Property."

32

Ehler further stated that per his investigation, before the City's improvements, the Keller Smithfield roadway and bridge were narrow, and the creek channel was quite narrow. After the project, the road and bridge are now approximately nine feet above their prior elevation, the Property, and a park immediately west of Keller Smithfield Road. The bridge opening was increased and the shape of the opening was changed. He stated that before construction, water that "would have backed upstream due to the constriction of the narrow bridge opening prior to overtopping the approach embankments and sheet flow[] slowly over [Keller Smithfield Road] from the park onto the Property, is now diverted through the widened opening under the bridge and roadway."

Ehler attached his report to his affidavit. In the report, he stated that "[i]ncreased development in the Big Bear Creek watershed since the 1982 Flood Insurance Study . . . was completed resulted in an increase in stormwater discharge into Big Bear Creek and increased water surface elevation in the creek." He acknowledged that the Property is located within the 100-year floodplain. He also stated that none of the storm events that the Halls complained of exceeded the two-year, one-hour storm event as defined in the City's development code. They also did not exceed a 100-year, 24-hour storm event.

Ehler noted that the CLOMR and LOMR applications from 1997 through 2002 used hydrologic data developed by the 1982 FEMA Flood Insurance Study for Tarrant County, but that significant changes due to development occurred in

33

the watershed between the time of the 1982 Flood Insurance Study and the 1999 CLOMR application. The August 23, 2000 revision to the Flood Insurance Study, however, did not include all development that occurred in the City between 1981 and 2000.

Ehler noted that the Halls had expressed concern to the City about drainage problems on the Property, including a letter sent by the Halls in February 1999 during the construction of the golf club and Bear Creek Parkway, and an April 2005 email relating to construction on Keller Smithfield Road. He noted that in May 2005, an engineering firm hired by the City sent a letter to the Halls stating that "there is no indication of any change to the base flood elevation across the subject (Hall) property."

Ehler also noted that the 1997 CLOMR request included a note from the City that stated, "This is to advise [FEMA] that the [City] does not want a regulatory floodway along a portion of Big Bear Creek . . . . Specifically, we want the [Rate Map] revised to show no floodway between cross-sections 133650 and 148320." Ehler noted that the Property is located approximately at station 148120.

Ehler concluded that there were significant changes in the watershed due to development between the 1982 Flood Insurance Study and the 1999 CLOMR application. He stated that "[s]tormwater runoff is generated when precipitation from rain and snowmelt events flows over land or impervious surfaces and does not percolate into the ground." He noted that "[g]reater population density

34

increases the amount of impervious area," and "[i]ncreased impervious area reduces the amount of natural ground available to absorb rainfall runoff, resulting in increased surface water runoff." He opined that "it is our determination that in the vicinity of the Hall residence, due to recent upstream and downstream improvements and modifications to the watershed it is now more likely that a storm of lower intensity will produce a flood event of higher magnitude."

He stated that a 2000 Flood Insurance Study (which was not included by the City with its plea to the jurisdiction) contained a table of 60 LOMRs from between 1995 and 2000, but they did not contain floodplain revisions to Big Bear Creek and did not list any projects in the City. He concluded that "the August 23, 2000 revisions to the [Flood Insurance Study] did not include development that occurred in the City of Keller between 1981 and 2000."

The Halls also included evidence relating to their notifying City staff about their concerns. In a 2001 letter from Kim to then-city manager Lyle Dresher, she stated that

> "[w]hen I spoke to you last by phone (February 15, 2001) I had just watched the west area of my property fill with water from the run-off of the roadways Keller-Smithfield and Bear Creek Parkway. The water then cascaded across the horse arena, cut a torrent across my driveway[,] and created several very large pools of water over my property. Five hours after the flooding began . . . there were still bodies of water that were three to four inches in depth."

She mentioned in the letter that they had had several conversations about the issue and that Dresher had visited her property.

35

The Halls also included an email from Kim to then-public works director Ilschner from April 2005 in which she stated, "I know you are going to hate me after all this is over but, I want to make SURE that drainage is being handled. It looks like I am going to be a lake. Please follow up." Also included was the May 2005 letter Ilshner sent to Kim, which mentioned a two-year study phase for improving drainage and classifying her concerns as related to "potential public storm water capacity or erosion problems." Specifically, the letter stated, "We received and appreciated your input into our City's storm water master planning process. As part of the data collection phase for the [City's] Comprehensive Storm Water Master Plan, [engineering firms] have helped us categorize over 150 citizen comments citywide into four categories." The category into which Kim's comment was classified was "potential public storm water capacity or erosion problems." There was also a category for "potential private property storm water problems," but her comment was not included in that category. The letter went on to say that the study phase of the project would be conducted over the next two years and that "[a] project may be developed to address your comment for possible inclusion in a future capital improvement program."

In summary, the jurisdictional evidence was that the City knew that development has an effect on flood risk; that it knew that much of the Property was in the floodplain; that Kim believed that the Property was experiencing increased flooding as the area became more developed and that she communicated this concern to the City before all of the improvements were

36

made; that the City raised Keller Smithfield Road to get it out of the floodplain; and that the water that formerly collected on that road would now go someplace else instead (which was in fact the reason for raising the road).

The City argued and produced evidence to show that the base flood elevation near the Property did not rise due to development, but the Halls' expert raised questions about the validity of some of this evidence with his assertions about the omission of City projects. The City's evidence only relates to how high the water could get during a base flood event at or near the Property. It does not show as a matter of law that the City did not know that water would collect on the Property more frequently and in storms of less magnitude. It did not, for example, show that it consulted experts about whether the water that once collected on Keller Smithfield Road would collect on the Property after the road was raised, since it would no longer collect on the roadway, or whether the raising of the roadway would effectively create a dam, trapping water on the Property.[61]

In other words, nothing in the City's evidence showed that the City did not know or believe that the reason that the water would not rise to about a certain level in the floodway generally was because the Property could serve as a

_____

[61]*See Bennett v. Tarrant Cnty. Water Control & Imp. Dist. No. One*, 894 S.W.2d 441, 448–49 (Tex. App.—Fort Worth 1995, writ denied) (stating that taking claims "must be decided on the particular facts of each case . . . and must be resolved through reason *in light of common sense* and experience") (emphasis added).

37

detention pond. The Halls' evidence at least raised a fact question about whether the Halls made the City aware that this was a concern. And in addition, Ehler's affidavit and report raised a fact question about whether the data that the City claimed supported its actions accurately reflected the real state of development in the area. Whether or not this evidence would be enough to sustain a jury verdict in the Halls' favor, it is enough to raise a question of fact about what the City knew such that the trial court did not err by denying the plea to the jurisdiction.

The City argues that the Halls asserted that it had the requisite knowledge "because the City knew that increased storm/rainfall runoff would result from all upstream and downstream development." It counters that the *Wilson*[62] case disposed of "the argument . . . that with each development, the City knew that runoff would increase and raise the levels in Big Bear Creek."

We first note again that the Halls' evidence raised a question about whether the CLOMR and LOMR requests used data that were not based on current conditions. We further note that the fact situations and procedural posture of *Wilson* make it distinguishable from this case. There is a difference between an argument that nothing presented to the City raised flags and so it proceeded with its plans, and an argument that the City foresaw that this particular problem could arise, causing it to consult with experts, who told the

---

[62]*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005).

City that this particular problem would not result from its actions.  The former is what the City argues in this case, and the latter situation is what occurred in *Wilson.*[63]  Here, the City did not argue and points to no evidence demonstrating as a matter of law that it had become concerned that the proposed improvements would effectively turn the Property into a detention pond and that it sought out expert opinion about whether that might happen.

Also, the appeal in *Wilson* came after a jury trial.[64]  Here, the appeal is before this court after a ruling on a plea to the jurisdiction, not a judgment after a jury trial.  We are considering only (1) whether the Halls pled a valid taking claim and (2) whether the jurisdictional evidence at least raises a fact issue on inverse condemnation.  At this point in the proceedings, the Halls did not have to establish by a preponderance of the evidence, much less as a matter of law, what the City knew.  Thus, *Wilson* does not dictate the holding in this case.

The City also argues that development that occurs upstream is beyond the City's jurisdiction and therefore beyond its control.  The Halls have never argued that the City can or should control development beyond its borders.  And this argument does not address the fact that in planning its own improvements, nothing prevents the City from considering the effect of all development that would affect the floodway.  The City does not explain how its own conclusions

---

[63] *See id.* at 828–29.

[64] *Id.* at 808.

39

about how development will affect the floodway can be accurate if it does not take actual conditions and factors affecting the floodway into consideration.

The City also argues that the City's regulations require development to be designed such that post-development runoff remains the same as pre-development runoff. As stated above, the Halls' expert addressed these regulations, stating that the projects submitted impact studies, but "each succeeding project was considered and approved based on a flood and drainage model which did not account for the prior development and increased run-off along [the creek] or the cumulative effect of the changes in drainage which resulted from such prior development." Thus, the fact that development plans included impact studies does not address the question of whether those studies adequately addressed potential flooding problems created by the development and whether the City should have relied upon them.

Toward the end of its brief, the City argues that "there is no suggestion about what the City should do to remedy the flooding. There is no switch to flip or valve to turn to keep the rain from falling from the sky." We are sure that this statement was intended to be humorous rather than merely gratuitous snideness and that the City does not seriously suggest that there is no possible remedy to stop a property from flooding when it rains. And of course, whether there is a remedy is irrelevant to the Halls' claim for compensation. All that matters on the question of compensation is whether the City took acts for a public benefit that it knew were substantially certain to cause damage to the Halls' property. We hold

40

that the City failed to establish as a matter of law that it did not have the requisite knowledge to sustain a taking claim or that nothing it did made flooding on the Property worse.

*The Trial Court's Exclusion of Evidence*

Also under this issue, the City complains about the trial court's exclusion of some of its jurisdictional evidence. The Halls objected to a number of the City's exhibits attached to its plea, some on the ground that it was expert testimony offered without designation and others on the ground that they were hearsay. The trial court sustained some but not all of the Halls' objections. After the trial court's ruling, the only evidence provided by the City that the trial court considered in making its ruling was the City's charter, aerial photographs of Big Bear Creek, excerpts from the City's Unified Development Code, the 1982 Rate Map that applied to the City, the 1982 Flood Insurance Study, the 1993 Rate Map, the 1995 Rate Map and Flood Insurance Study, a notice of claim letter from the Halls' attorney, the plat for the Property, the City's request for admissions to the Halls, and the Halls' response to the request.

For some of the evidence that the trial court excluded, the City does not explain its relevance in its brief. Generally, we do not have any duty to search the record and determine if evidence within it is relevant.[65] That being the case,

---

[65]*See Hall v. Stephenson*, 919 S.W.2d 454, 466–67 (Tex. App.—Fort Worth 1996, writ denied); s*ee also Harper v. Harper*, 8 S.W.3d 782, 784 (Tex. App.—Fort Worth 1999, pet. denied).

if we determined that this evidence was admissible, should we then consider it in our analysis, even if the City did not discuss it in its brief?

Some case law suggests that when reviewing a plea to the jurisdiction, we should review *all* admitted evidence, even if the appellant in the case does not direct us to consider it or discuss the evidence as part of its analysis. In *Texas Air Control Board*, the Supreme Court of Texas discussed the role of an appellate court when it questions standing (a component of subject-matter jurisdiction) on its own.[66] It stated that "when a Texas appellate court reviews the standing of a party *sua sponte*, it must construe the petition in favor of the party, and if necessary, review the entire record to determine if any evidence supports standing."[67]

This language does not directly address whether an appellate court must review the entire record when the court is considering jurisdiction in an appeal from the denial of a plea to the jurisdiction, including evidence that is not discussed in the appellant's brief. Both sides know that jurisdiction is at issue, the plaintiff has the opportunity to amend its pleadings to cure defects and to produce evidence as necessary to show jurisdiction, and the defendant has the opportunity to show the lack of jurisdiction. An appellate court in such a case is

---

[66] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445–46 (Tex. 1993).

[67] *Id.* at 446 (emphasis added).

facing a different procedural circumstance entirely than one in which the court raises the issue for the first time on appeal.

Some courts have applied the language in *Texas Air Control Board* to hold that courts of appeals also consider the entire record in the appeal from a trial court's ruling on a plea to the jurisdiction, not just when considering jurisdiction for the first time on appeal.[68] The Supreme Court has provided support for this approach, stating in *Miranda*, a case involving a plea to the jurisdiction, that it had considered "the relevant evidence submitted" to decide whether the trial court had jurisdiction and that it had searched the record for evidence relevant to the question.[69] And this court has stated in reviewing a plea to the jurisdiction, we must consider any jurisdictional evidence in the record.[70] Thus, for the excluded evidence not discussed by the City in its brief, if we concluded that the

---

[68] *See, e.g.*, *Nelson v. Vernco Const., Inc.*, 406 S.W.3d 374, 377 (Tex. App.—El Paso, 2013 pet. filed).

[69] *Miranda*, 133 S.W.3d at 231, 232; *see also Perry v. Del Rio*, 66 S.W.3d 239, 260 (Tex. 2001) (stating that the court *may* review the entire record to ascertain if any evidence supports the trial court's subject-matter jurisdiction); *see also Long v. Castle Texas Prod. Ltd. P'ship*, No. 11-0161, 2014 WL 1258167, at *6 n.20 (Tex. Mar. 28, 2014) (noting that parties may have excluded evidence included in the record).

[70] *Serv. Emp't Redevelopment v. Fort Worth Indep. Sch. Dist.*, 163 S.W.3d 142, 147 (Tex. App.—Fort Worth 2005), *rev'd on other grounds by* 243 S.W.3d 609 (Tex. 2007); *Osburn v. Denton Cnty.*, 124 S.W.3d 289, 292 (Tex. App.—Fort Worth 2003, pet. denied). *But see Lipan Indep. Sch. Dist. v. Bigler*, 187 S.W.3d 747, 753 (Tex. App.—Fort Worth 2006, pet. denied) (holding that the appellant did not show reversible error by the trial court's admission of evidence in ruling on a plea to the jurisdiction because it did not explain how the evidence caused the rendition of an improper denial of its plea to the jurisdiction).

evidence was admissible, case law suggests that we would still need to consider it, even without discussion by the City about its relevance. Other precedent from this court, however, suggests the opposite.[71]

Of course, even for the evidence that the City did reference somewhere in its brief, we have one more hurdle to jump over before we could hold the evidence was admissible, include it in our analysis, and then use that evidence as a basis for reversing the trial court's judgment: rule of appellate procedure 44.1.[72] The difficulty in this case is that for the evidence that the City says should have been admitted, the City fails to explain how its exclusion was harmful.[73] Even for excluded evidence that the City *does* mention somewhere in its brief, it does not make a specific argument about why its exclusion was harmful. Thus, in order to decide that we must reverse the trial court's judgment due to the exclusion of the evidence, we must make our own argument about why the exclusion was harmful.[74]

---

[71] *See Bigler*, 187 S.W.3d at 753.

[72] Tex. R. App. P. 44.1.

[73] *See id.*; *see also Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 217 (Tex. 2001) (applying harm analysis after "[a]ssuming without deciding, for the purposes of this case, that the trial court abused its discretion in excluding the State's evidence"); *James v. Kloos*, 75 S.W.3d 153, 159 (Tex. App.—Fort Worth 2002, no pet.) (assuming without deciding that the trial court's allowing certain testimony was improper and overruling the appellant's issue about the admission of the testimony because the appellant failed to make the requisite showing of harm).

[74] *See* Tex. R. App. P. 44.1.

We can deduce an implied harm argument from the fact that the City mentions some of the excluded evidence in the fact section of its brief or in its argument about jurisdiction, giving rise to an inference that the City believes the evidence is important to its jurisdictional argument (at least important enough to mention or discuss) and that therefore it was harmed by the evidence's exclusion. The dissent implicitly concludes that the exclusion was harmful because the dissent would hold that the excluded evidence, in combination with the admitted evidence, shows that the trial court lacked jurisdiction.

We disagree with the dissent about what the evidence shows. We have held that the evidence, even the evidence that the dissent believes was admissible and the exclusion of which was harmful, does not negate jurisdiction. Accordingly, even were we to conduct the admissibility analysis and hold that the evidence was admissible, we do not agree that the City was harmed by its exclusion. The City makes no separate argument for why it was harmed by the exclusion of its evidence other than the implied argument that the evidence negated jurisdiction, and we decline to craft any such an argument for the City. Accordingly, because the exclusion of the evidence was not harmful to the City, the determination of whether the trial court should have admitted it is not necessary to our holding, and we therefore need not address the City's challenge to the exclusion.[75]

---

[75]*See* Tex. R. App. P. 44.1, 47.1; *James*, 75 S.W.3d at 159.

45

*Whether the Halls Consented to the Flooding*

Finally under this issue, the City argued that the Halls consented to the flooding. The City stated that Kim purchased the Property "when it was abundantly clear that it was almost completely located in the 100-year flood plain according to the 1982 [Rate Map]" and that she built barns on the Property without raising them out of the floodplain. The City argued that because she built improvements on the Property and stored personal property in a flood-prone area, knowing that it was susceptible to flooding, she consented to the damaging of her property. It also asserted that the Halls partially consented to flooding or drainage on the Property by dedicating a portion of the Property—the eastern side separated from the rest of the parcel by the creek—for a drainage easement when Kim submitted a plat for the Property in 1986. The City argued that to the extent that the Halls sought compensation for this area of the Property, it had already been dedicated to the public's use for drainage purposes.

The City's argument is unpersuasive. The Halls are not suing for a taking of the part of the Property on which the City holds an easement. As for building in a floodplain, Kim took the Property as it was when she bought it, knowing that it was susceptible to occasional flooding. But the City points us to no authority holding that if you accept property with a certain condition, you consent to any action by another party that exacerbates or worsens that condition. Kim's position is not that the natural condition of the Property has resulted in more

46

flooding than she expected. Her position is that she took the Property in one condition, but the City altered its condition. We reject the City's argument.

We hold that the trial court did not err by denying the plea to the jurisdiction on the ground that the Halls did not plead a valid taking claim. We overrule the City's first issue.

*Whether the Halls Gave Notice*

In its second issue, the City argues that the trial court did not have subject-matter jurisdiction over the Halls' inverse condemnation claim when the evidence showed that the Halls did not comply with the notice of claims provision in the City's charter. The City argued below and on appeal that the Halls were required to give formal notice of their claim and that the only claim notice from the Halls was dated October 7, 2010.

The City attached its charter, which states that "[b]efore the [C]ity shall be liable to damage claim or suit for . . . damage to property, the person . . . whose property is damaged . . . shall give the city secretary notice in writing within thirty (30) days after the occurring of the alleged . . . damage." Section 311.034 of the government code states that "[s]tatutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity."[76] Based on these two provisions, the City requested

---

[76]Tex. Gov't Code Ann. § 311.034 (West 2013).

47

dismissal of the Halls' claim to the extent they sought compensation for property damage occurring more than thirty days before October 7, 2010.

Compliance with notice provisions in a city's charter is generally a statutory prerequisite to a suit against the city and therefore a prerequisite to a trial court's jurisdiction over such a suit.[77] Kim undisputedly informed various city officials over the years of her concerns about the flooding on the Property, including a 2001 letter to the city manager written within thirty days of a flood event, in which she stated that she wanted to "formally go on record" about her concerns. We need not consider whether Kim substantially complied with the notice provision or whether substantial compliance is sufficient to confer jurisdiction because notice provisions in city charters are not applicable to constitutional takings claims.[78] Accordingly, Kim did not have to give notice of her inverse condemnation claim to the City in order for the trial court to have jurisdiction over the claim.[79] We overrule the City's second issue.

---

[77]*Id.*; Tex. Loc. Gov't Code Ann. § 51.077 (West 2008) (providing that a home-rule municipality "may adopt rules, as it considers advisable, governing the municipality's liability for damages caused to a person or property").

[78]*City of Waco v. Roberts*, 121 Tex. 217, 222, 48 S.W.2d 577, 578–79 (1932), *disapproved of on other grounds by City of Houston v. Renault, Inc.*, 431 S.W.2d 322 (Tex. 1968); *see also Mayhew v. Town of Sunnyvale*, 774 S.W.2d 284, 297 (Tex. App.—Dallas 1989, writ denied); *San Antonio River Auth. v. Garrett Bros.*, 528 S.W.2d 266, 274 (Tex. Civ. App.—San Antonio 1975, writ ref'd n.r.e.); *Bates v. City of Houston*, 189 S.W.2d 17, 20 (Tex. Civ. App.—Galveston 1945, writ ref'd w.o.m.).

[79]We distinguish the facts in this case from a situation in which a claimant sued for compensation but failed to first use statutory administrative proceedings

### The Halls' Appeal

The Halls assert one issue in their brief, arguing that the trial court erred by overruling their hearsay objections to some of the City's evidence. Having overruled the City's two issues, however, the Halls' issue is moot. We overrule the Halls' issue.

### Conclusion

Having overruled the City's issues, and having overruled the Halls' sole issue, we affirm the trial court's order.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, WALKER, and GABRIEL, JJ.

WALKER, J., concurs without opinion.

GABRIEL, J., filed a dissenting opinion.

DELIVERED: May 1, 2014

---

by which the claimant could seek just compensation, the use of which "might have obviated the need for a takings suit." *City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 237 (Tex. 2011). When such procedures are available, "then the property simply ha[s] not, prior to the procedure's use, been taken without just compensation." *Id.* The City does not argue, and the record does not show, that the notice provision in the City's charter sets up a procedure that the Halls could have used to seek just compensation.