**Opinion issued May 23, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00033-CV

————————————

**THE CITY OF LAKE JACKSON AND VELASCO DRAINAGE DISTRICT,**
**Appellants**

**V.**

**RICKY ADAWAY, ROBERT ADEN, THOMAS ALBERS, BRIAN ALLEN, MAURO ALMENDAREZ, ROSA ALVAREZ, LISA ANDERSON, CYNTHIA BACA, JASON BARTON, DAVID BAUMAN, ERNESTO BAVAJAS, JORGE BEJARANO, JAMES BEYER, TOMMY BLAIR, BRENT BOWERS, BRIAN BOWERS, RAVEN BOYD, STEPHEN BROWNING, JAMES BRUCE, LINDA CALL, MILDRED CAMMACK, ROGEL CANALES, ISEDOR CANTU, THOMAS CARSON, ERNEST CASTRO, GERARDO CESPEDES, JAMES CHAPA, ROGELIO CHARLEZ, RICHARD CHILSON, HOMER CHOATE, ROBERT CLAY, JOHN COHEA, MICHAEL COLON, LORENZO CONTRERAS, MAGGIE COOK, CAROL COOPER, CHRISTOPHER COPUS, ARACELI CORTEZ, REBECCA CORTEZ, SANTIAGO CUELLAR, JERRY DANES, FERNANDO DEALBA, GERARDO DELACRUZ, JOSE DIAZ, BRAD DIER, RICHARD J. DUFFEY, NATA LEA EASTMAN, EDWARD EDWARDS, JAVIER ELIZONDO, TRACY ESCAMILLA, PETRONILO (NIEL) ESQUIVEL, DOMINIQUE ESTRELLO, JEFF EVANS, ALDO FRIAS, JARED FRIUDENBERG, JUAN GARCIA, JOE GARCIA, FELIX**

GARCIA, GERARDO GARCIA, ELIZABETH GARZA, HERMEREGILDO GARZA, ELIAS GARZA, ALEXANDER GARZA, ROBERT GASKINS, TAITE GELLASCH, GRABIEL (GABRIEL) GONZALES, ROLAND GONZALES, RAUL GONZALEZ, JAMES GRAY, JOHN GRAY, MARIO GUEL SR., ALBERTO GUERRERO, GUADALUPE GUEVARA, RUBEN GUTIERREZ, SCOTT HEATON, JASON HENNEKE, ROBERT HERNANDEZ, MICHAEL HINES, CHARLENE HUGHES, LARRY HULTQUIST, DARREN INGRAM, SANTIAGO ISAIS, ENRIQUE ISAIS, MOSI JAMES, GEORGINA JELINEK, FRANCISCO JEREDA, JUAN JIMENEZ, GREGORY JOHNSON, TORY JONES, JASON KING, JESSICA KNIGHT, RALPH KOFFEL, ANGELA KORNEGAY, CASEY KURTZ, BECKY LAFOUR, MARIA LAWS, STACY LEVIAS, ANTONIO LOPEZ, JANET MANGUM, BRENDA MANN, JAMIE MAY, JOSEPH MCADA, KEVIN MCKINNEY, KELLY MCNABB, EFRAIN MEDRANO, JOHN MENDOZA, ELIZABETH MEZA, LESTER "CHIP" MELTON, ANTONIO MILLAN, CHAD MOORE, JULIE MORALES, PEDRO MORALES, PATRICIA MORROW, PAUL MORROW, SAMUEL MOSAUER, DAN MOSER, JOE MUNDO, MICHAEL MUNN, R.P. MUSICK, JUAN NAVA, STEPHEN OLER, JAMES O'PRY, EDGAR ORDONES, VERONICA PADILLA, MARTIN PAIZ, VICTOR PARRA, HORACIO PENA, JAMES PHILLIPS, JOHN POTTS, MICHAEL PRASLICKA, MATTHEW QUIN, AMY QUINTANILLA, RUBEN REYES, DAVID REYES, ESTEBAN REYNA, DUSTIN RHOADES, KELLY ROBERTS, NELSON RODRIGUEZ, PABLO RODRIGUEZ, MARTHA RODRIGUEZ, SILVIA ROSALES, KENNETH ROUSER, KATHERINE RUBIO, JOE SAAVEDRA, JULIAN SALDAÑA, DONNA SANCHEZ, FRANCISCO SANCHEZ, STEVE SANDERS, PAT SHADDEN, JACK SHOOK, DON SHREVES, LESLIE SHRUM, BRETT SILVESTER, ALAN SIMMONS, NATALIE SINGH, ASHTON SLATER, PEGGY SLOCUM, JERRY SMITH, CHRIS SORIA, JUSTIN SPARKMAN, CHAD SPEERS, RICHARD SPENCER, BRIAN STANFORD, CRAIG STANZEL, HARRY STEWART, RAYMOND STILES, ROLLINS STUTZMAN, HARLEY SUTTON, FRANK TANNER, KENNETH TERRELL, LYNDA THOMAS, SHANNON TIGNER, DARRYL TINER, SEAN TOWEY, MAI THI TRUONG, TERRY TURNER, DONALD UTLEY, REBECCA VERMILLION, REBECCA VERMILLION, DANNY VICKERS, VICTOR WADE, VICTOR WADE, CARL WALDEN, LANCE WALLACE, JACK WALLIS, JAMIE WARDLOW, DAVID WATTS, MARK WESSELS, DOROTHY WEST, ROBERT WHITE, HENRY WILLIS, ROBERT WILLIS, FLOYD WILSON, ROBERT WILSON, KARL WINTERS, ORRIC

WOODARD, FRANKLIN WYATT-MERRITT, BARBARA ZETKA, LILLIAN ADEN, LINDSEY ALBERS, RHODE ALMENDAREZ, JASON BACA, KRISTEN BARTON, KAYLEE BAUMAN, GUADALUPE BEYER, DIMPLE BOWERS, LYNN BOWERS, JUDY HAILEY, PAMELA BROWNING, REBEKAH BRUCE, CONCEPCION CANALES, IDA CANTU, NORMA CASTRO, BRENDA CESPEDES, JULIA CHARLEZ, DAWN CHILSON, BARBARA CHOATE, KENNETH MATTHEW CHRONISTER, BARBARA CLAY, CORINA COLON, CLAUDIA CONTRERAS, STEPHEN COOK, DARLA COPUS, TANYA CORTEZ, GABRIELLA CUELLAR, VICTORIA DANES, JENNIFER DEALBA, MINDY DELACRUZ, SHANNON DIER, THE ESTATE OF PHILIP EASTMAN, KATHY EDWARDS, SYLVIA ELIZONDO, JUAN BOCANEGRA, NICOLE ESQUIVEL, AMBER ESTRELLO, THERESA EVANS, AMERICA FRIAS, MELINDA FRIUDENBERG, LINDA GARCIA, AMERICA GARCIA, VIRGINIA GARZA, AURORA GARZA, AIDA GARZA, CHANTEL GASKINS, CYNTHIA GONZALES, DORA GONZALEZ, WENDY GRAY, ELIZABETH GUERRERO, PENNY GUTIERREZ, KATHY HEATON, LORI HERNANDEZ, GRACE HINES, WILBURN HUGHES, MISTY INGRAM, CHRISTINA ESTRADA, CHENE COOKE-JEREDA, JINNA JIMENEZ, CINDY JONES, JARROD KNIGHT, RHONDA KOFFEL, JEFF KURTZ, EDDIE DEAN, CYNTHIA LOPEZ, JOHN "RUSTY" MANGUM, JAMES MANN, JOSH MAY, JULIE MCADA, IRMA MCKINNEY, ANTONIO MEZA, THOLOCCO MELTON, HILDA GUADALUPE PADILLA VEGA, MARIBEL GARZA, DOLORES MOSAUER, BLANCHE MOSER, ANNA TREVINO, LACI MUNN, NORMA NAVA, RENEE O'PRY, MELISSA PAIZ, MARIA PARRA, MARIA LOZANO, SHIRLEY PHILLIPS, LAVONDA POTTS, JAMIE PRASLICKA, DINA QUIN, BENITO QUINTANILLA, JINA REYES, NORMA REYES, GRISELDA REYNA, LETICIA RODRIGUEZ, CHAUALITA RODRIGUEZ, JAVIAR MENDOZA, CANDELARIO CISNEROS, KENZI ROUSER, SHERRI SAAVEDRA, SARAH HUFFAKER, LUCIA SANDERS, MARILLA SHOOK, PERRY SHRUM, AMY SILVESTER, BRIDGETTE SIMMONS, AARON MASON, NANCEE SMITH, LAUREN SORIA, ROBBI SPARKMAN, LAURA SPEERS, CYNTHIA BROWN, DANIELLE STANFORD, LYDIA STANZEL, LINDA STEWART, NICOLE STILES, DALIA STUTZMAN, AMANDA SUTTON, DEBORAH MADDOX-TANNER, BECKY TERRELL, DAVID THOMAS, JEANA TINER, DANIEL VERMILLION, DANIEL VERMILLION, SHERRY YOUNG, MELISSA WALLACE, TESSA WALLIS, HOWARD WARDLOW, CHERYL WATTS, JENNIFER WESSELS, CAROLYN

3

**WILLIS, THERESA WILLIS, MICKYE WILSON, KRISTEN WINTERS, STEPHANI WYATT-MERRITT, TERRY ALEXANDER, RANDY ALEXANDER, TERESA ARRAMBIDE, HOMER ARRAMBIDE, JANIE AUD, JIM AUD, MA. ESTHER SANCHEZ VEGA, ESTEBAN AVELLANEDA, GLORIA BARRINGTON, JAMES BARRINGTON, CHRISTOPHER BASCOM, OLAYA BEJARANO, BARBARA BLUEJACKET, RODNEY BLUEJACKET, RONALD BRAGG, JASON BREAUX, JOHNYE BROWN, STEVE BROWN, WILLIAM CAILLOVET, JOVITA CARRASCO, JOSE CARRASCO, MELISSA CARSON, PATROCINA MORALES, RENE CELEDON, CAROL COBB, ANNE COHEA, ANNETTE COOK, CARMEN COOK, SEAN COOK, LAVERNE COOPER, ZENO COOPER, IRIS D. LONGORIA, RICHARD B. DUFFEY, ANN EVANS, KRISTINA ENGHOLM, ALYSON GLOVER, ALEXANDER GLOVER, JOSEPH GOENS, MARLENA GRAY, CASSANDRA GRICE, ALVIN GRICE, KEREN CORDERO, MITCHELL HAMILTON, JASON HAYES, REBA HOLDER, VALERIE HOWARD, ROBERT HOWARD, DARYL JAHNS, KAREN JAHNS, TAMMY LEGG, DERRICK JONES, SHERRY KIRTS, DAVID KIRTS, JUANITA LOPEZ, ABELARDO LOPEZ, JARED MACHACEK, CANDIE MACHACEK, DEBRA MCDONALD, JON MCDONALD, REBECCA MOORE, ERIC MOORE, JERRICAH MORALES, JIMMY CRIDDLE, SHERRIE MOSQUEDA, NOE MOSQUEDA, DELILA MYERS, SYLVIA RIVAS, MICHAEL RIVAS, JEREMY SANDERS, SHELLY SANDERS, JOSHUA SAVOY, STEVEN SHADDEN, EDWARD WRIGHT, JESSICA SHORTER, BRENDA SIMONEAU, DONALD SIMONEAU, CYNTHIA SPRAYBERRY, MAYLINN TARBUTTON, DAVID TARBUTTON, JAMES THOMPSON SR., MICHAEL TINNON, SHIRLEY TOLBERT, MICHAEL TORRANCE, CARINE TORRANCE, DEBBIE WARREN, BRUCE WARREN, DENISE SOLIS, EVERETT WRIGHT, SANDRA WRIGHT, LAWRENCE WRIGHT, GLENDA ZINK, AND DAVID ZINK, Appellees**

**On Appeal from the 239th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 95727-CV**

## MEMORANDUM OPINION

In this case, property owners in Brazoria County sued the City of Lake Jackson and the Velasco Drainage District, asserting the governmental entities took certain flood mitigation actions during and after Hurricane Harvey that caused their properties to flood. The governmental entities filed pleas to the jurisdiction, claiming governmental immunity deprived the trial court of subject-matter jurisdiction, which the trial court denied. For the reasons discussed below, we affirm in part, reverse and render in part, and reverse and remand in part the trial court's order.

## BACKGROUND

The City of Lake Jackson, like the rest of Brazoria County, was subjected to heavy rainfall during Hurricane Harvey in late August of 2017. The City and the local drainage authority, the Velasco Drainage District, took three flood-mitigation measures that are at issue. They: (1) closed a metal flap gate in the Brazos Canal on the south side of FM 2004, a highway north of Lake Jackson, to stop water in the canal from flowing from the north side of the highway to the south side; (2) used several motorized pumps to pump water in the canal from the south side of FM 2004 back to the north side; and (3) enlisted volunteers to build a temporary sandbag dam along FM 2004 to stop water from flowing over the north side of the highway to the south side, where Lake Jackson is located. The City does not dispute that it took these actions, but the District denies its involvement.

5

The plaintiffs in the underlying suit, more than 400 owners of property in and around the neighboring town of Richwood, alleged that these three actions diverted flood water away from the City of Lake Jackson at the expense of Richwood. These actions, the property owners claimed, caused their properties to flood when the properties would not otherwise have flooded.

The property owners sued the City and the District in February 2018. The property owners alleged claims for a taking under Article 1, Section 17 of the Texas Constitution; nuisance; trespass; negligence; and a statutory taking under Chapter 2007 of the Government Code. Both the City and the District filed pleas to the jurisdiction, claiming their governmental immunity deprived the trial court of subject-matter jurisdiction. In response, the property owners filed an amended petition in September 2018, also adding a number of new plaintiffs at that time.

In their pleas to the jurisdiction, the City and District argued that all of the property owners' claims failed on the element of causation: the City's and District's actions, they claimed, did not cause the property owners' flooding, and therefore the property owners failed to allege any claims for which governmental immunity had been waived.

*Dr. Grounds's Report*

The City and the District filed with their pleas to the jurisdiction an expert report by Dr. John S. Grounds, a hydrology expert with a Ph.D. in civil engineering

6

and extensive experience in planning, analyzing, and designing drainage and flood control projects. After reviewing the information in the case as well as historical weather data, Dr. Grounds concluded that the City's and District's actions during Hurricane Harvey did not cause the property owners' properties to flood.

Typically, water in the Brazos Canal is pumped northward into Bastrop Bayou through a set of three metal flap gates. The water flows through the metal flap gates into a pumping chamber, where it is pumped northward into Bastrop Bayou. But when Bastrop Bayou is at flood stage, the metal flap gates are supposed to close to stop water from flowing in either direction. During Hurricane Harvey, one of the metal flap gates was stuck open at a 45-degree angle due to debris in the canal; this allowed some water to flow south from Bastrop Bayou into the Brazos Canal for about three days. The appellants installed motorized pumps just outside the canal to pump water that had been flowing south into the canal and instead force it to flow northward, into the pumping chamber and eventually back into Bastrop Bayou.

Dr. Grounds concluded that water was flowing southward into the canal faster than it was being pumped northward into the pumping chambers. He calculated the minimum amount of water flowing through the open metal flap gate was 45.8 cubic feet per second. He calculated the maximum amount of water the pumps could have pumped while they were in use was 22.4 cubic feet per second. Thus, Dr. Grounds

concluded, the motorized pumps had no effect on flooding in the area north of the canal.

After the last metal flap gate was closed, the appellants continued to pump water northward but used only three motorized pumps, down from five. At this point, the three pumps were pumping water northward at a rate of only 4.56 cubic feet per second. This too, he concluded, did not contribute to flooding in the area north of the canal.

The sandbag dam, Dr. Grounds explained, was placed in "ineffective flow areas or areas where [water] conveyance is minimal." Treating the sandbag dam as a levee, Dr. Grounds created a hydraulic model to determine the combined impact of the pumping and the sandbag dam on the water surface area. The combined impact, according to the model, was 0.00 feet for both a 100-year flood and 500-year flood event. Therefore, he concluded, the City's and District's actions did not cause the property owners' properties to flood.

Dr. Grounds explained that Richwood and the City of Lake Jackson are flood prone because they are located in a 100-year floodplain, meaning they would be expected to flood during an event equaling or exceeding a 100-year flood. Hurricane Harvey was a 500-year flood event. Dr. Grounds concluded that flooding in the area was caused by an overflow from the Brazos River.

*Dr. Emerman's Report*

The property owners submitted an expert report in response, provided by Dr. Steven H. Emerman, a consultant specializing in hydrologic modeling, with a Ph.D. in geophysics and more than 30 years of experience teaching hydrology and geophysics. Ultimately, Dr. Emerman concluded the sandbag dam caused the property owners' properties to flood. Dr. Emerman hypothesized that Dr. Grounds's hydraulic model could have been based on incorrect or outdated data and that perhaps the "greatest source of error" could have been using the model to calculate a "steady-state flow solution." The hydraulic model Dr. Grounds used calculated the water surface area as if Bastrop Bayou had already reached an equilibrium—in other words, as if Bastrop Bayou had overflowed to flood the area in question, then measured the amount by which the water surface area would differ if the pumping did not occur, and the sandbag dam did not exist; that amount was negligible. Dr. Emerman agreed that calculation could have been correct in certain circumstances, but it did not reflect the actual circumstances of "the sudden (time-dependent) appearance of a sandbag dam in response to an overflow of Bastrop Bayou and the resulting diversion of water and the creation of a flood wave that progresses through space and time." Dr. Emerman explained that Dr. Grounds's model did not match the observed timing and location of flooding. Further, he explained that Dr. Grounds's explanation for the flooding, an overflow of the Brazos River, could not

9

have caused the flooding in Richwood because other cities along its banks did not similarly flood, and the floodwater in Richwood was clear and could not have been the muddy water of the Brazos River.

Dr. Emerman instead concluded that, over the four days the sandbag dam was in place, it diverted 27.7 billion gallons of water away from the City of Lake Jackson and toward Richwood. Dr. Emerman arrived at this number by estimating the difference in water elevation on each side of the sandbag dam (about one foot) for the length of the sandbag dam (about 2,000 feet) and calculating how much water would have flowed over the sandbags for the length of time the sandbag dam was in place (about four days). The sandbag dam was diverting about 4.8 million gallons of water per minute, totaling 27.7 billion gallons of water over four days. Dr. Emerman concluded the sandbag dam diverted enough water to flood Richwood to a depth of 46 feet. That would only have occurred, though, if all of the flood water remained in Richwood. Instead, water flowed out of Bastrop Bayou toward the sandbag dam, where it was diverted northward, then traveled back along the southern floodplain of the bayou, then across FM 2004 and along another canal where it eventually re-entered the bayou. Thus, even though 27.7 billion gallons of water passed through Richwood, it did not stay; most of the floodwater re-entered Bastrop Bayou, and Richwood only flooded to an average depth of two feet. Dr. Emerman concluded,

contrary to Dr. Grounds's opinion, that the sandbag dam caused Richwood and the surrounding areas to flood.

However, there was one point on which both experts were in complete agreement. Dr. Emerman stated that he completely agreed with Dr. Grounds that the impact of the pumping on the water surface area was negligible. Just as Dr. Grounds did, he concluded the pumping did not cause the flooding of Richwood or other surrounding areas.

The City moved to strike Dr. Emerman's testimony on the grounds that he was not qualified to testify as to the causes of flooding, that his methodology was unreliable, and that he did not have a sufficient factual basis for his conclusions. The trial court did not rule on this motion.

*City's and District's Appeal*

After a hearing, the trial court denied the City's and District's pleas to the jurisdiction. The City and District now appeal.

**DISCUSSION**

The City and District have each only raised one issue on appeal, with several subparts. Both appellants contend the trial court erred in denying their pleas to the jurisdiction as to each of the property owners' claims because the appellants' governmental immunity has not been waived. The appellants contend their governmental immunity has not been waived for multiple reasons. Primarily, the

11

appellants contend their actions did not cause the property owners' properties to flood, and because each claim the property owners asserted includes proximate cause as an element, each claim must fail. The appellants also contend that various exceptions to waivers of immunity—exceptions that retain their immunity—apply to their actions in this case.

After discussing principles generally applicable to a plea to the jurisdiction based on governmental immunity, we consider each of the property owners' claims in turn.

*Plea to the Jurisdiction*

Subject-matter jurisdiction is "essential to a court's power to decide a case." *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) (per curiam) (quoting *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000)). It is the plaintiff's burden to allege facts that affirmatively demonstrate the court's jurisdiction to hear the claim. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019). When the plaintiff sues a governmental entity, that burden includes establishing a waiver of governmental immunity. *See id.* Governmental immunity defeats a court's subject-matter jurisdiction and may be asserted in a plea to the jurisdiction. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003); *City of Dallas v. Turley*, 316 S.W.3d 762, 767 (Tex. App.—Dallas 2010, pet. denied).

12

A plea to the jurisdiction may challenge the pleadings, jurisdictional facts, or both. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). When a plea to the jurisdiction challenges the pleadings, we liberally construe the pleadings in the plaintiff's favor, taking all factual assertions as true and looking to the plaintiff's intent. *See City of Ingleside v. City of Corpus Christi*, 469 S.W.3d 589, 590 (Tex. 2015) (per curiam); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively negate jurisdiction, then the plaintiffs should be given an opportunity to amend. *Miranda*, 133 S.W.3d at 226–27. If the pleadings affirmatively negate jurisdiction, then the plea to the jurisdiction should be granted. *Id.* at 227.

When a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties. *Id.* This standard mirrors that of a traditional summary judgment, and the burden is on the governmental entity to meet the summary-judgment standard of proof. *Id.* at 228; *see also* TEX. R. CIV. P. 166a(c) (traditional summary-judgment motion). Under the traditional summary-judgment standard, the movant has the burden to establish it is entitled to judgment as a matter of law, and a defendant may do so by conclusively disproving at least one essential element of the plaintiff's cause of action. TEX. R. CIV. P. 166a(c); *Little v. Tex. Dep't of Crim. Just.*, 148 S.W.3d 374, 381 (Tex. 2004). Once the

governmental entity meets its burden by "assert[ing] and support[ing] with evidence that the trial court lacks subject[-]matter jurisdiction," the burden then shifts to the plaintiff to produce evidence showing there is a "disputed material fact regarding the jurisdictional issue." *Miranda*, 133 S.W.3d at 228. This standard protects plaintiffs from having to "put on their case simply to establish jurisdiction." *Id.* (quoting *Bland*, 34 S.W.3d at 554). When reviewing evidence in a plea to the jurisdiction that challenges jurisdictional facts, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in its favor. *Id.* Unless a pleaded jurisdictional fact is challenged and conclusively negated, we take it as true for the purpose of determining subject-matter jurisdiction. *City of Austin v. Leggett*, 257 S.W.3d 456, 462 (Tex. App.—Austin 2008, pet. denied); *see also Miranda*, 133 S.W.3d at 228 ("[W]e take as true all evidence favorable to the nonmovant."). If the evidence creates a fact question regarding the jurisdictional issue, the plea cannot be granted, and the factfinder will resolve the issue. *Miranda*, 133 S.W.3d at 227–28. If the evidence is undisputed or fails to raise a fact question, we may rule on the plea to the jurisdiction as a matter of law. *Id.* at 228.

We review a trial court's ruling on a plea to the jurisdiction de novo. *Id.* Because the trial court may consider claims individually, dismissing those over which it lacks subject-matter jurisdiction and retaining claims over which it has

14

jurisdiction, we too review each claim on an individual basis for subject-matter jurisdiction. *See Thomas v. Long*, 207 S.W.3d 334, 338 (Tex. 2006).

**Constitutional Takings Claim**

The property owners alleged that the appellants' actions, diverting flood water away from the City of Lake Jackson and toward Richwood, caused damage to their properties and resulted in an unconstitutional taking of their private property. On appeal, the appellants argue the trial court erred in denying their pleas to the jurisdiction because the property owners failed to state a viable takings claim.

**A. Applicable Law**

Article I, Section 17 of the Texas Constitution provides: "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . ." TEX. CONST. art. I, § 17. When a governmental entity takes, damages, or destroys[1] private property without first paying for it, the owner may sue to recover damages.[2] *Tarrant Reg'l Water Dist. v.*

---

[1] Although "taking," "damaging," and "destruction" of a person's property are three distinct claims that arise under Article I, Section 17, courts use the term "taking" as a shorthand to refer to all three types of claims. *City of Dallas v. Jennings*, 142 S.W.3d 310, 313 n.2 (Tex. 2004).

[2] Typically, a governmental entity must compensate a property owner before appropriating the property by filing a statutory condemnation proceeding, but when the governmental entity takes, damages, or destroys property without paying first, the property owner may recover damages for the taking in what is also called an "inverse condemnation" suit. *Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex. 1992).

15

*Gragg*, 151 S.W.3d 546, 554 (Tex. 2004). The constitution itself waives governmental immunity for a takings claim. *El Dorado Land Co., L.P. v. City of McKinney*, 395 S.W.3d 798, 801 (Tex. 2013). But the governmental entity retains immunity unless the plaintiff alleges a viable takings claim. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476, 491 (Tex. 2012). To plead a viable takings claim and establish waiver of immunity, a plaintiff must allege that the governmental entity: (1) intentionally performed certain acts; (2) that resulted in a taking of property; (3) for public use. *Sw. Bell Tel., L.P. v. Harris Cnty. Toll Rd. Auth.*, 282 S.W.3d 59, 61 (Tex. 2009). Whether a taking has occurred is a question of law. *Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 806 (Tex. 2016).

The first element of a takings claim, intent, can be satisfied by alleging facts to show the governmental entity: "(1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action." *City of Dallas v. Jennings*, 142 S.W.3d 310, 314 (Tex. 2004). A plaintiff does not need to allege that the governmental entity intended to cause the damage. *Id.* But allegations of mere negligence or that the governmental entity intended to commit the act that caused the damage do not satisfy the intent element. *Id.* at 313; *Gragg*, 151 S.W.3d at 554.

The intent element also requires specificity. *Kerr*, 499 S.W.3d at 800. To satisfy the intent element, the plaintiff must allege the governmental entity knows

16

that "a *specific* act is causing *identifiable* harm" or that "*specific property damage* is substantially certain to result" from the government action. *Id.* (quoting *Jennings*, 142 S.W.3d at 314). There is no liability where the governmental entity "only knows that someday, somewhere, its performance of a general governmental function . . . will result in damage to some unspecified parcel of land within its jurisdiction." *Id.*

The second element of a takings claim, that the governmental entity's actions resulted in a taking, requires the plaintiff to allege proximate cause. *See Hearts Bluff Game Ranch*, 381 S.W.3d at 483 ("Proximate cause is an essential element of a takings case."). The government's actions must have been the proximate cause of the plaintiff's damages for the government to be liable for a takings claim. *Id.* at 484; *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 539 (Tex. 2013) (plaintiff "cannot recover damages the government did not cause").

The third element of a takings claim, public use, is satisfied by alleging facts that show the property has been taken or damaged "in furtherance of the public interest." *Gragg*, 151 S.W.3d at 555.

A taking can be physical or regulatory. *Id.* at 554. A physical taking occurs when the governmental entity physically invades private property or unreasonably interferes with a landowner's right to use and enjoy private property. *Id.* A regulatory taking occurs when the governmental entity "restricts a property owner's rights to

17

such an extent as to become the functional equivalent of a physical seizure." *San Jacinto River Auth. v. Medina*, 627 S.W.3d 618, 622 (Tex. 2021).

Government action that results in flooding a property can constitute a physical taking. *Gragg*, 151 S.W.3d at 559. For these types of claims, generally a single flooding event does not rise to the level of a taking, and "recurrence is a probative factor in determining the extent of the taking." *Id.* at 555. But "recurrence goes to the merits of the plaintiffs' claims and is not a pleading requirement to invoke the trial court's jurisdiction." *City of El Paso v. Mazie's L.P.*, 408 S.W.3d 13, 25 (Tex. App.—El Paso 2012, pet. denied); *accord City of Socorro v. Campos*, 510 S.W.3d 121, 130–31 (Tex. App.—El Paso 2016, pet. denied); *see also Gragg*, 151 S.W.3d at 555 (evaluating evidence of recurrence after full trial on merits of takings claim). Thus, at this stage, we do not need to consider whether this single flooding event rises to the level of a taking.

**B. Analysis**

*Intent*

The City argues the property owners have produced no evidence to show the City acted with the intent necessary to establish a constitutional taking. Specifically, the City asserts that the record lacks any evidence the City intended to damage the property owners' specific properties, the property owners notified the City that its

18

actions were causing Richwood to flood, or the City knew its actions would cause their properties to flood.

Again, to plead intent in a takings claim, a plaintiff must allege the governmental entity "(1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action." *Jennings*, 142 S.W.3d at 314. In a plea to the jurisdiction, we first look to the pleadings to determine if the plaintiff has alleged facts that affirmatively demonstrate the court's jurisdiction, construing the pleadings in the plaintiff's favor and taking all factual assertions as true. *Swanson*, 590 S.W.3d at 550; *City of Ingleside*, 469 S.W.3d at 590; *Miranda*, 133 S.W.3d at 226.

For the element of intent, the property owners pleaded that the City's actions were intended to prevent water from flowing toward the City of Lake Jackson and that it knew or was substantially certain these actions would result in flooding Richwood residents' properties. Thus, the property owners sufficiently pleaded that the City acted with the required intent.

But the City claims there is jurisdictional evidence that proves the City did not act with the required intent. A governmental entity may challenge jurisdictional facts with evidence, but the burden is on the governmental entity to produce evidence that conclusively disproves the plaintiff's jurisdictional facts. *See Miranda*, 133 S.W.3d at 228 (governmental entity may challenge jurisdictional facts by asserting

19

and supporting with evidence that trial court lacks jurisdiction); *Leggett*, 257 S.W.3d at 462 (plaintiff's jurisdictional facts taken as true unless conclusively negated). Here, the City refers to two documents in the record to establish its intent and disprove the property owners' factual allegations.

First, the City refers to a news release Richwood issued while the flooding was occurring. The news release is titled, "Official Update: Flooding," and among other things, it states:

> Both the City of Richwood and Lake Jackson are coordinating with each other and talking back and forth to try and move some of the flood water into Oyster Creek, which still has capacity within its banks. Speaking of which, Lake Jackson has informed us that tomorrow they are going to try and pump some of the water from their ditch along FM 2004 and redirect towards Oyster Creek.

The City argues this statement shows the City was trying to divert water toward Oyster Creek and not onto any particular properties. But our inquiry is not whether the City intended to divert floodwater onto any particular properties. *See Jennings*, 142 S.W.3d at 314 (plaintiff does not need to allege governmental entity intended to cause damage to plead viable takings claim). Rather, our inquiry is whether the City knew that (1) diverting flood water toward Oyster Creek was causing identifiable harm; or (2) specific property damage was substantially certain to result from diverting flood water toward Oyster Creek. *See id.* The news release does not address either of these factors. Thus, this evidence does not conclusively disprove the

20

property owners' jurisdictional facts. *See Leggett*, 257 S.W.3d at 462 (plaintiff's jurisdictional facts taken as true unless conclusively negated).

Second, the City refers to Dr. Grounds's expert report for the proposition that the City could not have known that its conduct would cause the property owners' specific properties to flood because all of their properties are located in a 100-year floodplain, meaning they would be expected to flood during a 100-year flood event, and Hurricane Harvey was a much more severe 500-year flood event. But Dr. Grounds's study was conducted after the flooding had occurred. In analyzing intent, "[t]he government's knowledge must be determined as of the time it acted, not with [the] benefit of hindsight." *Kerr*, 499 S.W.3d at 806 (alteration in original) (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 821 (Tex. 2009)). Dr. Grounds's report does not address the City's knowledge at the time it acted. *Cf. City of Keller v. Hall*, 433 S.W.3d 708, 721–23 (Tex. App.—Fort Worth 2014, pet. denied) (city met its initial burden to disprove intent element by providing reports created by city's hired engineering firms *before* city began construction project that concluded proposed construction project would not increase flood levels).[3] Again, this evidence

---

[3] We are aware that, unlike the city in *City of Keller v. Hall*, here, the City was responding to an emergency and likely did not have time to hire engineering firms to analyze the impact of the City's proposed action. *See* 433 S.W.3d at 723. But our inquiry at this stage is only whether the property owners have demonstrated the trial court's subject-matter jurisdiction to hear their claims, not whether the City acted reasonably under the emergency circumstances. *See Swanson*, 590 S.W.3d at 550.

21

does not conclusively disprove the property owners' jurisdictional facts relating to the City's intent. *See Miranda*, 133 S.W.3d at 228 (governmental entity must meet traditional-summary-judgment standard of proof); *Leggett*, 257 S.W.3d at 462 (plaintiff's jurisdictional facts taken as true unless conclusively negated).

Neither of the documents the City cites conclusively disprove the property owners' allegations that the City diverted flood water away from the City of Lake Jackson, knowing or having substantial certainty this would cause Richwood to flood. Because the City did not conclusively disprove the property owners' jurisdictional fact allegations, we take them as true. *See Leggett*, 257 S.W.3d at 462. And, as we have already concluded, the property owners sufficiently pleaded that the City acted with the required intent. *See Bexar County v. Colombrito*, No. 04-12-00284-CV, 2012 WL 6743569, at *3 (Tex. App.—San Antonio Dec. 31, 2012, no pet.) (mem. op.) (affirming denial of plea to jurisdiction where governmental entity failed to conclusively disprove plaintiff's jurisdictional facts regarding intent element of takings claim).

The City also argues there is no evidence that it diverted flood water with the intent to damage the property owners' specific properties, emphasizing the specificity of the intent element discussed in *Harris County Flood Control District v. Kerr*. *See* 499 S.W.3d at 800 ("The government must know that 'a *specific* act is causing *identifiable* harm' or know that '*specific property damage* is substantially

22

certain to result from an authorized government action.'") (quoting *Jennings*, 142 S.W.3d at 314). But the City did not produce evidence to conclusively disprove the property owners' allegations that the City knew flooding in Richwood was substantially certain to occur, so the burden did not shift to the property owners to produce evidence. *See Miranda*, 133 S.W.3d at 228; *Leggett*, 257 S.W.3d at 462. The property owners did not allege the City knew the specific addresses of the properties in Richwood that would flood, but no case holds a plaintiff's inverse-condemnation pleading must be that specific. *See San Jacinto River Auth. v. Burney*, 570 S.W.3d 820, 834 (Tex. App.—Houston [1st Dist.] 2018), *aff'd sub nom. San Jacinto River Auth. v. Medina*, 627 S.W.3d 618 (Tex. 2021).[4] The property owners have alleged that the City diverted an amount of water significant enough to have caused flooding in the City of Lake Jackson. While the City may not have intended to flood any other areas, we may reasonably infer the City could have known that diverting such a significant amount of water would have caused flooding in the areas to the north, where the water was diverted. *See Miranda*, 133 S.W.3d at 228

---

[4]  "None of *Jennings*, *Gragg*, or *Kerr* squarely address the [governmental entity]'s contention that for it to have committed a taking, it had to have intended or known that the flooding of particular homeowners' specific properties would be the substantially certain result of its release of water. The United States Supreme Court evidently considers this an open question under federal takings law . . . ." *Burney*, 570 S.W.3d at 834.

(reviewing court indulges every reasonable inference in favor of nonmovant in plea to jurisdiction).

Finally, the City also argues there is no evidence the property owners notified the City that its actions were causing their properties to flood. But again, the City did not first produce evidence negating the property owners' allegation they notified the City it was causing damage, so the burden did not shift to the property owners to produce evidence, and we may consider their pleadings and take their factual allegations as true. *See City of Ingleside*, 469 S.W.3d at 590; *Miranda*, 133 S.W.3d at 226; *Leggett*, 257 S.W.3d at 462. The property owners alleged they notified the City that its actions were resulting in the flooding of Richwood, but it continued to divert flood water in that direction. The intent element is satisfied, for the purpose of a plea to the jurisdiction, when a city is informed its actions are causing damage but continues to perform the actions anyway. *See City of El Paso v. Ramirez*, 431 S.W.3d 630, 640 (Tex. App.—El Paso 2014, pet. denied) (intent element satisfied, in challenge to pleadings, where pleadings alleged city had been informed of damage by landowners yet continued to operate landfill that was causing damage); *cf. State v. Gafford*, No. 04-03-00168-CV, 2003 WL 22011302, at *3 (Tex. App.—San Antonio Aug. 27, 2003, no pet.) (mem. op.) (intent element not satisfied, in jurisdictional-fact challenge, where evidence showed state employees were told to stop clearing trees from plaintiff's property and they did so).

Because the City did not present evidence negating this element, the property owners did not have the burden to present evidence creating a fact question on this issue. *See Miranda*, 133 S.W.3d at 228 ("[A]fter the [governmental entity] asserts *and supports with evidence* that the trial court lacks subject[-]matter jurisdiction, we simply require the plaintiffs . . . to show that there is a disputed material fact regarding the jurisdictional issue.") (emphasis added); *see also Tex. Dep't of Transp. v. Olivares*, 316 S.W.3d 89, 103 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("[I]n a plea to the jurisdiction, a defendant must produce evidence that the trial court lacks jurisdiction *before* the plaintiff has the burden to present evidence establishing a fact question regarding jurisdiction."). Taking the property owners' allegations as true, *see City of Ingleside*, 469 S.W.3d at 590; *Miranda*, 133 S.W.3d at 226, they have alleged the City acted with the necessary intent to satisfy the intent element of a takings claim.

*Proximate Cause*

Next, both the City and the District argue the property owners failed to raise a fact question on the proximate-cause element of their takings claim. We disagree.

The expert report by Dr. Grounds, who analyzed the flood impact on behalf of the City, concluded that the appellants' actions did not cause the property owners' properties to flood. Specifically, he concluded that closing the metal flap gate and pumping water from the Brazos Canal into the pumping chamber did not increase

25

the water surface elevation in Bastrop Bayou or on the property owners' properties. Nor did the placement of sandbags along FM 2004 increase the water surface elevation, he concluded. Rather, the flooding in the area was the result of an overflow from the Brazos River because this was a 500-year flood event. On this element, the appellants asserted and supported with evidence that they did not cause the property owners' flooding, so the burden shifted to the property owners to produce evidence showing there was a fact question regarding proximate cause. *See Miranda*, 133 S.W.3d at 228.

The property owners met this burden. The property owners' expert report, by Dr. Emerman, concluded that the sandbag dam diverted more than 27 billion gallons of water to Richwood, which caused their properties to flood. Dr. Emerman identified possible errors in Dr. Grounds's analysis and noted that Dr. Grounds's model did not match observation. He explained why he thought an overflow of the Brazos River could not have caused the property owners' flooding, as Dr. Grounds concluded. Thus, the experts disagreed as to whether the appellants' actions caused the property owners' properties to flood.

The City asks us to disregard Dr. Emerman's expert report because his opinion is unreliable and conclusory. *See Coastal Transp. Co., Inc. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (citing TEX. R. EVID. 401; *Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997)) (expert testimony that is

26

"conclusory or speculative" is not relevant and does not raise fact issue to defeat summary judgment); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997) ("[A]n expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology. . . . Under that circumstance, the expert's scientific testimony is unreliable and, legally, no evidence."). The City claims Dr. Emerman was not qualified to testify as to the causes of flooding, his methodology was unreliable, and he did not have a sufficient factual basis for his conclusions.

The first two issues the City raises regarding Dr. Emerman's testimony—his qualifications and the reliability of his methodology—are preliminary issues the trial court must decide first. *See Coastal Transp. Co.*, 136 S.W.3d at 233 (when reliability of expert's underlying methodology is at issue, trial court must first examine in its role as gatekeeper); *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 411 (Tex. 1998) (objection to admissibility of expert testimony based on reliability of methodology cannot be raised for first time on appeal; examination of underlying methodology is task for trial court as gatekeeper and allows full record to be developed for appeal); *Croysdill v. Old Republic Ins. Co.*, No. 08-21-00191-CV, 2023 WL 1869094, at *7 (Tex. App.—El Paso Feb. 9, 2023, no pet. h.) ("Whether an expert is qualified is a preliminary question to be decided by the trial court." (citing TEX. R. EVID. 104)). In

this case, the trial court did not rule on the City's motion to strike Dr. Emerman's testimony based on his qualifications and the unreliability of his methodology.

We may, however, consider for the first time on appeal whether expert testimony is "conclusory or speculative and therefore non-probative on its face"; in such cases, "there is no need to go beyond the face of the record." *Coastal Transp.*, 136 S.W.3d at 233. "A conclusory statement asserts a conclusion with no basis or explanation." *Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019). "[A]n expert's statement or opinion is conclusory when: (1) he asks the jury to take his word that his opinion is correct but offers no basis for his opinion or the bases offered do not actually support the opinion; or (2) he offers only his word that the bases offered to support his opinion actually exist or support his opinion." *Id.* at 769.

Dr. Emerman's report is not conclusory on its face. In the report, Dr. Emerman explained the method and assumptions he used to reach his conclusion that the sandbag dam diverted so much water. Estimating the length of the dam and the difference in water on either side based on photos and testimony from City employees, he applied the numbers to the rectangular weir equation, which, as he explained, "is used to determine flow rates in canals or narrows streams based upon the difference in water elevations on either side of the weir." The result of the equation is the rate at which water would have flowed across the highway in the absence of the dam, and the presence of the dam "could be regarded as a row of

28

pumps that was pumping water from the south back to the north" at the rate given by the equation. He also used a digital elevation model that was developed using 2018 Lidar data,[5] as well as photos of the area and drone videos, to come up with an estimated flood path. Without determining the reliability of Dr. Emerman's methods, we can at least say his report gives an adequate basis for his opinion and offers more than a request to take his word that his opinion is correct. *See id.*

The City also argues Dr. Emerman's report is conclusory and speculative because it fails to rule out other causes of flooding. *See Helena Chem. Co. v. Cox*, No. 20-0881, 2023 WL 2335694, at *10 (Tex. Mar. 3, 2023) ("[A]n expert's 'failure to rule out other causes of the damage renders his opinion little more than speculation.'" (quoting *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 559 (Tex. 1995))). But Dr. Emerman's report did rule out alternative theories of causation, at least those raised by Dr. Grounds's report. *See id.* (expert testimony need only rule out "other plausible causes *raised by the evidence*" (alteration in original) (quoting *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010))). The report identifies what Dr. Emerman considered to be flaws in the model Dr. Grounds used, explains that the model was not consistent with observed data because

---

[5]     Lidar data provides ground elevation information for use in hydraulic/hydrologic model development and in FEMA Digital Flood Rate Insurance Maps. *Coastal Lidar*, TEX. NAT. RES. INFO. SYS., https://data.tnris.org/collection?c=8ea19b45-7a66-4e95-9833-f9e89611d106#7.25/28.915/-95.813 (last visited March 14, 2023).

other municipalities along Oyster Creek did not flood even though Dr. Grounds's report attributed the flooding to an overflow of the Brazos River into Oyster Creek, and offered an alternative explanation that was arguably more consistent with the observed data. While the factfinder may ultimately conclude one theory of causation is more likely than the other, Dr. Emerman's report at the very least addresses and rules out other causes of flooding. *See id.*

The District claims the property owners have produced no evidence to show the District was responsible for building the sandbag dam. But the District did not file a no-evidence motion for summary judgment, and the District did not produce any evidence to support its plea to the jurisdiction on this ground. *See Miranda*, 133 S.W.3d at 228 (only after defendant asserts and supports with evidence that trial court lacks jurisdiction is plaintiff required to produce evidence raising fact question). Therefore, the property owners did not yet have the burden to produce evidence showing the District's involvement. The property owners alleged that both the City and the District were involved in building the sandbag dam, and in reviewing a plea to the jurisdiction that challenges only the pleadings, we must take all of the nonmovant's factual assertions as true. *See City of Ingleside*, 469 S.W.3d at 590; *Miranda*, 133 S.W.3d at 226.

The District also asserts that Dr. Emerman confirmed that the District was not involved in building the sandbag dam, but his report makes no such claim. The report

describes the three actions the property owners alleged caused their flooding, and it describes the impact of each action, while only mentioning the City and its employees; we do not take this to mean Dr. Emerman concluded that the District was not involved in any of the actions. And, at any rate, we must indulge every reasonable inference and resolve any doubts in favor of the property owners. *Miranda*, 133 S.W.3d at 228 (reviewing court indulges every reasonable inference in favor of nonmovant in plea to jurisdiction). Combining the property owners' allegations with Dr. Emerman's expert report, we must resolve any doubt that the District was involved in the property owners' favor.

The property owners produced evidence to raise a fact question on the element of proximate cause. *See id.* at 227–28. The experts disagree as to whether the appellants' actions caused the property owners' properties to flood. Therefore, the trial court could not grant the appellants' pleas to the jurisdiction as to the constitutional takings claim. *See id.*

*Public-Necessity Doctrine*

Both the City and the District argue that even if the property owners stated a viable takings claim within Article 1, Section 17's waiver of immunity, the public-necessity doctrine provides an exception to that waiver of immunity. The public-necessity doctrine recognizes that a governmental entity may destroy property "[i]n the case of fire, flood, pestilence or other great public calamity, when immediate

31

action is necessary to save human life or to avert an overwhelming destruction of property." *Steele v. City of Houston*, 603 S.W.2d 786, 792 n.2 (Tex. 1980) (quoting NICHOLS, THE LAW OF EMINENT DOMAIN § 1.43 (rev. 3d ed. 1979)). Both the City and the District argue the public-necessity doctrine is applicable here. But the public-necessity doctrine is not a jurisdictional issue; it is a defense the appellants must prove. *See id.* at 792 ("The defendant . . . may defend its actions by proof of a great public necessity."); *see also Prestonwood Ests. W. Homeowners Ass'n v. City of Arlington*, No. 02-21-00362-CV, 2022 WL 3097374, at *5–6 (Tex. App.—Fort Worth Aug. 4, 2022, no pet.) (mem. op.) (concluding trial court erred in granting plea to jurisdiction on public-necessity ground because public-necessity doctrine is defense to liability that must be proved). Thus, the trial court did not err in denying the plea to the jurisdiction as to the constitutional takings claim even though the appellants raised the public-necessity doctrine.

\* \* \*

In sum, we have determined the property owners sufficiently pleaded that the appellants acted with the intent necessary to state a viable takings claim, the property owners produced evidence to raise a fact question on the element of proximate cause, and even though the appellants raised the public-necessity doctrine, that is an affirmative defense to be proved on the merits, not a jurisdictional defect. Therefore,

32

we overrule the appellants' sole issue on appeal as to the property owners' constitutional takings claim.

*Constitutional Nuisance and Trespass*

The property owners also stated claims for intentional nuisance and trespass under Article 1, Section 17 of the Texas Constitution. These claims are alternate grounds for recovery under Article 1, Section 17. *See Tarrant County v. English*, 989 S.W.2d 368, 374 (Tex. App.—Fort Worth 1998, pet. denied). Immunity is waived and a governmental entity may be liable for a nuisance when it "rises to the level of a constitutional taking." *Jennings*, 142 S.W.3d at 316. Similarly, we apply the same standard in determining whether a governmental entity may be liable for trespass. *See Ramirez*, 431 S.W.3d at 643 (where plaintiff stated viable claim for inverse condemnation, plaintiff also stated trespass and non-negligent nuisance claim); *City of Midland v. Walton*, No. 11-08-00053-CV, 2008 WL 5100942, at *2–3 (Tex. App.—Eastland Dec. 4, 2008, pet. denied) (mem. op.) (analyzing takings, trespass, and nuisance claims together, applying elements of takings claim to all three, and concluding that all survived plea to jurisdiction).

Because the property owners have stated a viable constitutional takings claim, they have also stated claims for nuisance and trespass that rise to the level of a constitutional taking. *See Jennings*, 142 S.W.3d at 316. Therefore, the trial court did not err in denying the appellants' plea to the jurisdiction as to these claims. We

33

overrule the appellants' sole issue on appeal as to the property owners' intentional nuisance and trespass claims under the constitution. [6]

## Common-Law Torts

The property owners also asserted common-law tort claims of negligence, negligent nuisance, and negligent trespass against the City and the District.

As to the City, the property owners alleged that the City's actions were proprietary functions, and therefore the City had no immunity for those actions.

As to the District, and the City's actions in the alternative if they were not proprietary functions, the property owners alleged the Texas Tort Claims Act waives immunity for these claims because the damages were caused by motor-driven equipment.

*Governmental or Proprietary Functions*

## A. Applicable Law

For the City, we must consider whether its actions were governmental or proprietary. Under the common law, governmental entities are immune from liability for governmental functions unless the legislature waives immunity by statute. *City of Fort Worth v. Adams*, 888 S.W.2d 607, 610 (Tex. App.—Fort Worth 1994, writ denied). Governmental functions are those "in the performance of purely

---

[6]  The property owners also pleaded claims for negligent trespass and nuisance under the Texas Tort Claims Act, which we discuss below.

governmental matters solely for the public benefit." *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006) (quoting *Dilley v. City of Houston*, 222 S.W.2d 992, 993 (1949)). Cities, however, are not immune under the common law for proprietary functions. *Adams*, 888 S.W.2d at 610. Proprietary functions of a city "are those conducted 'in its private capacity, for the benefit only of those within its corporate limits, and not as an arm of the government.'" *Tooke*, 197 S.W.3d at 343 (quoting *Dilley*, 222 S.W.2d at 993)). Thus, in considering common-law tort claims against a city, we conduct a two-step inquiry to determine whether the city has immunity from suit. *Hunnicutt v. City of Webster*, 641 S.W.3d 584, 591 (Tex. App.—Houston [14th Dist.] 2022, no pet.). First, we determine whether the city's actions are proprietary or governmental. *Id.* If the action is proprietary, the city has no immunity. *Tooke*, 197 S.W.3d at 343. If the action is governmental, the second step is to determine if the legislature has waived immunity by statute, such as the Texas Tort Claims Act. *Hunnicutt*, 641 S.W.3d at 591.

The Texas Constitution authorizes the legislature to "define for all purposes those functions of a municipality that are to be considered governmental and those that are proprietary." TEX. CONST. art. XI, § 13(a). Under that authority, the legislature created a nonexclusive list of governmental and proprietary functions to determine whether a city has immunity from tort claims. *See* TEX. CIV. PRAC. & REM. CODE § 101.0215.

35

Section 101.0215 of the Texas Civil Practice and Remedies Code states that a city's governmental functions include those functions "exercised by the municipality in the interest of the general public," like police and fire protection and control. *Id.* § 101.0215(a). Relevant to our inquiry, a city's governmental functions include "sanitary and storm sewers," "waterworks," and "dams and reservoirs." *Id.* § 101.0215(a)(9), (11), (19). Section 101.0215 defines a city's proprietary functions as "those functions that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality," including "the operation and maintenance of a public utility," "amusements owned and operated by the municipality," and "any activity that is abnormally dangerous or ultrahazardous." *Id.* § 101.0215(b). Proprietary functions specifically do not include any of the governmental functions listed in the statute. *Id.* § 101.0215(c). Both lists of governmental functions and proprietary functions in Section 101.0215 are not exclusive; if an activity is not listed, we apply the general definitions of each function provided in the statute to determine the nature of the activity. *Wasson Ints., Ltd. v. City of Jacksonville*, 559 S.W.3d 142, 150 (Tex. 2018) (*Wasson II*).

**B. Analysis**

Our first step is to determine whether the City's actions—closing the metal flap gate, pumping water into the canal, and building the sandbag dam along the highway—were governmental or proprietary. *See Hunnicutt*, 641 S.W.3d at 591.

36

These actions fall squarely within the enumerated governmental functions in Section 101.0215: "sanitary and storm sewers," "waterworks," and "dams and reservoirs." TEX. CIV. PRAC. & REM. CODE § 101.0215(a)(9), (11), (19). The property owners argue the City's actions were proprietary functions because they were performed in the interest of the inhabitants of the City of Lake Jackson alone, not the general public. While the inhabitants of the City of Lake Jackson may have benefited from the City's actions, these actions are governmental functions under Section 101.0215. *See id.*; *City of Friendswood v. Horn*, 489 S.W.3d 515, 523 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (city's flood-control actions were governmental functions as matter of law because legislature designated activities to be governmental functions in Section 101.0215). Having determined the City's actions were governmental functions, we proceed to the second step of our inquiry, whether the legislature has waived immunity. *See Hunnicutt*, 641 S.W.3d at 591.

*Waiver of Immunity under Texas Tort Claims Act*

The property owners contend that for the District, and for the City if its actions were governmental functions, immunity is waived under the Texas Tort Claims Act. The Act provides a limited waiver of immunity for the state and political subdivisions of the state, like the City and District. *See* TEX. CIV. PRAC. & REM. CODE §§ 101.025(a), 101.001(3) (waiving immunity for governmental units "to the extent of liability created by this chapter" and defining "governmental unit" to

37

include political subdivisions of the state such as cities and drainage districts, respectively). Therefore, we consider the City and District together in analyzing whether the Act waived immunity here.

## A. Applicable Law

The Act waives immunity for property damage "proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if . . . the property damage . . . arises from the operation or use of a motor-driven vehicle or motor-driven equipment." *Id.* § 101.021. The phrase "arises from" requires a "nexus" between the use of the motor-driven equipment and the plaintiff's damages. *Whitley*, 104 S.W.3d at 543. Thus, the motor-driven equipment "must have actually caused" the damages. *Id.* (quoting *Tex. Nat. Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 869 (Tex. 2001)).

## B. Analysis

The property owners claim the Act waives immunity for the appellants' actions because the appellants used motor-driven water pumps to divert water from the City of Lake Jackson and cause the property owners' properties to flood.

The appellants' expert, Dr. Grounds, concluded in his expert report that pumping water in the canal to the north side of FM 2004 had no effect on the water surface elevation and did not cause flooding in Richwood. Thus, the appellants asserted and supported with evidence that their use of motor-driven pumps did not

38

cause the property owners' damages; the "nexus" between their use of motor-driven equipment and the property owners' flooding is missing. *See Miranda*, 133 S.W.3d at 228; *Whitley*, 104 S.W.3d at 543.

The property owners, then, were required to produce evidence to show there was a disputed material fact regarding causation, *see Miranda*, 133 S.W.3d at 228, which they failed to do. The property owners' expert, Dr. Emerman, concluded the "pumping was ineffective," and "the sandbag dam, but not the pumping, was certainly responsible for the flooding in the City of Richwood." Dr. Emerman explained that he was "in full agreement" with Dr. Grounds's conclusion "that the impact of pumping was negligible." He ultimately asserted that the pumping, "more likely than not, did not cause the flooding of Richwood," but the construction of the sandbag dam did.

This evidence fails to raise a fact question on the issue of causation. The experts are in agreement that the appellants' use of motor-driven water pumps did not cause the property owners' damages. Because the motor-driven equipment did not cause the property owners' damages, and the evidence on that point is undisputed and fails to raise a fact question, the property owners have failed to allege a claim that falls within the Act's waiver of immunity. Thus, the property owners have failed to affirmatively demonstrate the court's jurisdiction over their common-law tort

39

claims of negligence, negligent nuisance, and negligent trespass.[7] *See Swanson*, 590 S.W.3d at 550. The trial court erred in denying the appellants' plea to the jurisdiction as to these claims.

Having concluded the property owners failed to allege a claim that falls under the Act, we do not need to consider whether the Act's exception for emergency situations applies to the appellants' actions. *See* TEX. CIV. PRAC. & REM. CODE § 101.055 (waiver of immunity does not apply to claims arising from employee's actions while reacting to emergency situations).

\* \* \*

Because the property owners did not establish a valid waiver of immunity for their common-law tort claims of negligence, nuisance, and trespass against the City and District, the trial court lacked subject-matter jurisdiction over these claims. The trial court therefore erred in denying the appellants' plea to the jurisdiction as to these claims. We sustain the appellants' sole issue as to these common-law tort claims.

---

[7]     The property owners' pleadings are not clear as to whether they alleged intentional or negligent nuisance and trespass. We presume they intended to allege negligent nuisance and trespass here because: (1) the Act does not waive immunity for intentional torts, TEX. CIV. PRAC. & REM. CODE § 101.057 (waiver of immunity does not apply to claim arising out of intentional tort); and (2) the property owners' intentional nuisance and trespass claims fall within the waiver of immunity under Article 1, Section 17 of the Texas Constitution.

## Private Real Property Rights Preservation Act

Lastly, the property owners alleged a takings claim under Chapter 2007 of the Government Code, the Private Real Property Rights Preservation Act.[8]

## A. Applicable Law

Chapter 2007 waives immunity "to the extent of liability created by" the chapter. TEX. GOV'T CODE § 2007.004. It authorizes private real property owners to bring suit to determine whether a governmental action resulted in a taking as defined by the chapter. *Id.* § 2007.021(a). The chapter defines a taking as either: (1) a governmental action that would constitute a taking under the United States Constitution or Sections 17 or 19, Article I, of the Texas Constitution; or (2) a governmental action that causes a "reduction of at least 25 percent in the market value of the affected private real property." *Id.* § 2007.002(5). The chapter applies to both regulatory and physical takings. *Medina*, 627 S.W.3d at 627.

Chapter 2007 expressly does not apply in certain situations. It does not apply to a governmental action "taken out of a reasonable good faith belief that the action is necessary to prevent a grave and immediate threat to life or property" or a governmental action "taken in response to a real and substantial threat to public health and safety[,] designed to significantly advance the health and safety

---

[8] Chapter 2007 is sometimes referred to as PRPRPA. *See, e.g.*, *City of Houston v. Guthrie*, 332 S.W.3d 578, 585 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

purpose[,] and [that] does not impose a greater burden than is necessary to achieve the health and safety purpose." TEX. GOV'T CODE § 2007.003(b)(7), (13). For cities specifically, the chapter does not apply to any action other than a governmental action "that has effect in the extraterritorial jurisdiction of the municipality, excluding annexation, . . . that enacts or enforces an ordinance, rule, regulation, or plan that does not impose identical requirements or restrictions in the entire extraterritorial jurisdiction of the municipality." *Id.* § 2007.003(a)(3), (b)(1).

## B. Analysis

### *The City*

The City argues Chapter 2007 does not apply to its actions in this case because the actions—closing the metal flap gate, pumping water into the canal, and building the sandbag dam along the highway—did not enact or enforce any kind of regulatory requirement in its extraterritorial jurisdiction, and the chapter expressly does not apply to any other action by a city. *See id.* § 2007.003(a)(3), (b)(1). The property owners respond by arguing that the City's actions caused flooding in some "area[s] of extraterritorial jurisdiction, but not the entire extraterritorial jurisdiction of the City"; thus, the City's actions had an unequal effect in its extraterritorial jurisdiction. We agree with the City.

In construing a statute, our primary goal is to give effect to the legislature's intent. *Jefferson County v. Jefferson Cnty. Constables Ass'n*, 546 S.W.3d 661, 667

(Tex. 2018). We start by considering the "ordinary meaning of the statutory text." *Id.* (quoting *In re Ford Motor Co.*, 442 S.W.3d 265, 271 (Tex. 2014) (orig. proceeding)). When the ordinary meaning is unambiguous, "we interpret that statute according to its plain language." *In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004) (orig. proceeding). Section 2007.003(a)(3), by its ordinary meaning, describes only a city's action that "enacts or enforces an ordinance, rule, regulation, or plan" and that "does not impose identical requirements or restrictions" throughout the entirety of the city's extraterritorial jurisdiction. TEX. GOV'T CODE § 2007.003(a)(3). The City's alleged actions here, diverting floodwater so that some areas outside the City flooded but others did not, did not impose any kind of requirement or restriction in its extraterritorial jurisdiction. *Cf. City of Houston v. Guthrie*, 332 S.W.3d 578, 590 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (city's regulatory action of enforcing ban on possession of fireworks along roads in city and annexed areas had effect of banning some fireworks stands but not others in extraterritorial jurisdiction and fell within action described by Section 2007.003(a)(3)). Therefore, Section 2007.003(a)(3) does not describe the City's actions in this case.

Because Chapter 2007 expressly does not apply to any action by a city other than an action described by Section 2007.003(a)(3), and we have concluded the City's actions are not the kind of actions described by Section 2007.003(a)(3), it follows that Chapter 2007 does not apply to the City's alleged actions. *See* TEX.

43

GOV'T CODE § 2007.003(a)(3), (b)(1). Chapter 2007 waives immunity only "to the extent of liability created by" the chapter, *id.* § 2007.004, so it does not waive immunity for the property owners' Chapter 2007 claim against the City in this case. Therefore, the trial court erred in denying the City's plea to the jurisdiction as to the property owners' Chapter 2007 claim. We sustain the City's sole issue as to this claim.

*The District*

The analysis for the District is different because Section 2007.003(a)(3) only applies to an action by a municipality, which the District is not. *See id.* § 2007.003(a)(3). To state a claim for which immunity is waived under Chapter 2007 against a governmental entity other than a city, a property owner must allege a governmental action that constitutes a taking under the state or federal constitutions or that causes a reduction of at least 25 percent in market value. *See id.* §§ 2007.002(5) (defining "taking"), 2007.021(a) (authorizing suit to determine whether governmental action resulted in taking); *see also Medina*, 627 S.W.3d at 622, 624.

The property owners have stated a claim under Chapter 2007 against the District. As discussed above, the property owners have alleged governmental action that constitutes a taking under Article 1, Section 17 of the Texas Constitution. Thus, they have also alleged a claim against the District under Chapter 2007.

44

The District argues that its actions fall under two exceptions from Chapter 2007. Chapter 2007 does not apply to a governmental action "taken out of a reasonable good faith belief that the action is necessary to prevent a grave and immediate threat to life or property" or a governmental action "taken in response to a real and substantial threat to public health and safety[,] designed to significantly advance the health and safety purpose[,] and [that] does not impose a greater burden than is necessary to achieve the health and safety purpose." TEX. GOV'T CODE § 2007.003(b)(7), (13). The District argues that both exceptions apply here.

The Supreme Court considered but did not adopt a similar argument in *San Jacinto River Authority v. Medina*. 627 S.W.3d at 628–31. The *Medina* case also involved property owners who asserted the river authority's flood-mitigation measures during Hurricane Harvey caused their properties to flood, and the *Medina* property owners sued the river authority for a statutory taking under Chapter 2007. *Id.* at 621. The river authority, like the District in this case, argued that Sections 2007.003(b)(7) and (13) applied, depriving the courts of jurisdiction and requiring dismissal of the property owners' claims. *Id.* at 628. But, reviewing only the pleadings as it was required to do in reviewing a Rule 91a motion to dismiss, the Court concluded that the *Medina* property owners' pleadings did not conclusively establish that either statutory exception applied. *Id.* at 631; *see also* TEX. R. CIV. P. 91a.6 (court may not consider evidence in ruling on motion to dismiss and must

decide based solely on pleading of cause of action). The *Medina* property owners'

pleadings did not allege that the river authority acted with a reasonable good faith

belief the action was necessary to prevent a grave and immediate threat or that the

river authority's action was designed to significantly advance a health and safety

purpose without imposing a greater burden than necessary. *Medina*, 627 S.W.3d at

630–31. Thus, the Court could not dismiss the *Medina* property owners' Chapter

2007 claims based on the emergency exceptions. *Id.* at 631.

In this case, too, the property owners did not affirmatively allege that either

emergency exception applied. We, too, must consider only the pleadings because the

District did not produce evidence to negate the property owners' factual allegations

relating to the emergency exceptions. *See Miranda*, 133 S.W.3d at 226–28. While

the property owners' pleadings indicate that Hurricane Harvey presented a "grave

and immediate threat to life or property" and a "real and substantial threat to public

health and safety," their pleadings do not address whether the District acted with a

reasonable good faith belief that the action was necessary to prevent a grave and

immediate threat or whether its action was designed to significantly advance a health

and safety purpose without imposing a greater burden than necessary. *See* TEX.

GOV'T CODE § 2007.003(b)(7), (13). The property owners affirmatively

demonstrated jurisdiction by pleading a taking under Chapter 2007 and did not

affirmatively negate jurisdiction by alleging that either emergency exception

46

applied. *See Swanson*, 590 S.W.3d at 550; *Miranda*, 133 S.W.3d at 226–27. Thus, the trial court did not err in denying the District's plea to the jurisdiction as to these Chapter 2007 takings claims, except for the claims by the late-added plaintiffs we discuss below.

*Late-Added Plaintiffs*

Finally, the District argues that some property owners did not timely file claims under Chapter 2007 so those claims should be dismissed.[9] We agree. The District also requested attorney's fees and court costs as the prevailing party.

Chapter 2007 requires a suit under that chapter to be filed "not later than the 180th day after the date the private real property owner knew or should have known that the governmental action restricted or limited the owner's right in the private real property." TEX. GOV'T CODE § 2007.021(b). This filing requirement is jurisdictional. *San Jacinto River Auth. v. Lewis*, 629 S.W.3d 768, 775 (Tex. App.—Houston [14th Dist.] 2021, no pet.); *see also* TEX. GOV'T CODE § 311.034 (providing that statutory prerequisites to suit are jurisdictional requirements in all suits against governmental entity).

The property owners allege that the appellants' actions between "late August 2017 and early September 2017" caused their properties to flood. Yet the District

---

9     The District also argues these property owners did not provide timely notice of their claims under the Texas Tort Claims Act, but because we have already determined the trial court should have dismissed those claims, we do not address them here.

47

points out that some property owners, whom it calls the "late-added plaintiffs," did not join the suit until the property owners filed their first amended petition on September 27, 2018.[10] This was more than a year after their properties flooded and outside the 180-day deadline for filing suit.

The property owners did not address this issue in the trial court and on appeal argue only briefly that the appellants had actual notice of these claims. While actual notice can relieve a plaintiff of the requirement to provide notice under the Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE § 101.101(c), there is no equivalent provision in Chapter 2007. Thus, it is undisputed that the late-added plaintiffs—the property owners who joined the lawsuit on September 27, 2018—filed suit more than 180 days after they knew or should have known the appellants' actions restricted or limited their rights to their properties. *See* TEX. GOV'T CODE § 2007.021(b). Because the 180-day deadline is jurisdictional, *Lewis*, 629 S.W.3d at 775, the trial court erred in denying the District's plea to the jurisdiction as to the late-added plaintiffs' claims under Chapter 2007.

The District argues that it is the prevailing party and thus entitled to attorney's fees and court costs under Chapter 2007. *See* TEX. GOV'T CODE § 2007.026(b) (requiring court to award reasonable and necessary attorney's fees and court costs to "a governmental entity that prevails in a suit or contested case filed under" Chapter

---

[10] These plaintiffs are identified by name in the District's appellate brief.

2007). Whether a particular statute authorizes attorney's fees is a question of law for the court. *Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (per curiam). Generally, lack of subject-matter jurisdiction bars a court from doing anything other than dismissing the suit. *See Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 578 (Tex. 2013). But when a court lacks jurisdiction over claims with a mandatory-fee provision, the court still has the power to award attorney's fees. *See Feldman v. KPMG LLP*, 438 S.W.3d 678, 685–86 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (lack of jurisdiction over claim for declaratory judgment does not preclude fee award under the Declaratory Judgments Act). The term "prevailing party" means the party who successfully prosecutes an action or successfully defends against it. *Weng Enters., Inc. v. Embassy World Travel, Inc.*, 837 S.W.2d 217, 222–23 (Tex. App.—Houston [1st Dist.] 1992, no writ). Because the District successfully defended against the late-added plaintiffs' Chapter 2007 claims, it is the prevailing party against these property owners and is entitled to the reasonable and necessary attorney's fees and court costs it incurred in defending against the late-added plaintiffs' claims. *See id.*; TEX. GOV'T CODE § 2007.026(b).

* * *

We sustain the District's sole issue as to the late-added plaintiffs' Chapter 2007 claims. We reverse the trial court's order denying the District's plea to the jurisdiction as to the Chapter 2007 claims of late-added plaintiffs, named in the

49

District's appellate brief, and remand to the trial court with instructions to dismiss those late-added plaintiffs' Chapter 2007 claims and to determine the amount of reasonable and necessary attorney's fees and court costs to which the District is entitled as the prevailing party on the late-added plaintiffs' Chapter 2007 claims.

## CONCLUSION

In sum, we affirm in part, reverse and render in part, and reverse and remand in part the trial court's order denying the City's and District's pleas to the jurisdiction. Specifically, we:

(1) affirm the denial of the City's and District's pleas to the jurisdiction as to the constitutional takings claims, constitutional nuisance claims, and constitutional trespass claims;

(2) reverse the denial of the City's and District's pleas to the jurisdiction as to the common-law tort claims of negligence, negligent nuisance, and negligent trespass and instead render judgment dismissing these claims for lack of subject-matter jurisdiction;

(3) reverse the denial of the City's plea to the jurisdiction as to the Chapter 2007 takings claims and instead render judgment dismissing these claims for lack of subject-matter jurisdiction;

(4) affirm the denial of the District's plea to the jurisdiction as to the Chapter 2007 takings claims, except for the claims asserted by the late-added plaintiffs; and

(5) reverse the denial of the District's plea to the jurisdiction as to the late-added plaintiffs' Chapter 2007 takings claims and instead remand this issue to the trial court with instructions to:

> (a) dismiss the Chapter 2007 claims of the late-added plaintiffs named in the District's appellate brief; and

> (b) determine the amount of reasonable and necessary attorney's fees and costs to which the District is entitled as the prevailing party on the late-added plaintiffs' Chapter 2007 claims.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Hightower, and Guerra.